ATTORNEY FOR APPELLANT
Jeffrey D. Stonebraker
Chief Public Defender
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE
Steve Carter
Attorney General of Indiana

Scott L. Barnhart
Deputy Attorney General
Indianapolis, Indiana

_____

## In the
## Indiana Supreme Court

**FILED**
Nov 12 2008, 9:18 am

CLERK
of the supreme court,
court of appeals and
tax court

_____

No. 10S05-0811-CR-588

RUDY WAYNE CARDWELL,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

_____

Appeal from the Clark County Superior Court, No. 10D01-0509-FB-084
The Honorable Jerome F. Jacobi, Judge

_____

On Petition to Transfer from the Indiana Court of Appeals, No. 10A05-0703-CR-129

_____

**November 12, 2008**

**Boehm, Justice.**

Rudy Wayne Cardwell challenges the appropriateness of his sentence under Indiana Rule of Appellate Procedure 7(B). Concluding that Cardwell's aggregate sentence of thirty-four years is inappropriate in light of the nature of his offense and his character, we revise his sentence to consecutive terms of nine and eight years for an aggregate sentence of seventeen years.

## Facts and Procedural History

In September 2005, Cardwell lived in Jeffersonville, Indiana with his girlfriend, Star Gentry, Gentry's three-year-old daughter, S.G, and H.G., the couple's one-year-old daughter. Cardwell and Gentry had been dating for about four years, and Cardwell described his relationship with S.G. as "father type."

On the morning of September 8, 2005, Cardwell cared for both children while Gentry finished her night shift at a local convenience store. Cardwell gave S.G. some spaghetti for breakfast around 5:30 a.m. and left the kitchen to check on H.G., who was playing in another room. When he returned to the kitchen, he slipped and fell in spaghetti on the floor. S.G.'s arms, hands, and shirt were covered in spaghetti. Irritated, Cardwell asked S.G., "How did the spaghetti get on the floor?" S.G. did not respond to Cardwell's repeated questioning, and Cardwell told her she would have to sit on the couch with him and would not be allowed to watch cartoons or play with toys because "she was going to be punished." S.G. started to cry.

Cardwell took S.G., still crying, to the bathroom to clean up. He removed her shirt, squirted some soap in her hands, turned on the faucet, and placed her hands in the water. S.G. immediately said, "Daddy the water is hot." Cardwell testified that he thought S.G. was trying to avoid questions about the spaghetti, so he continued to hold her hands under the water. S.G. then jerked away and said, "Daddy my hands are burning." Cardwell felt the water and found that it was hot. He saw that S.G.'s hands were hot and pink and placed them in cold water. He then applied an aloe gel to her hands and wrapped them in some cloths.

By this point, Gentry was scheduled to get off work in a few minutes, so Cardwell placed the children in the car and went to pick her up. He told Gentry what had happened and said that they needed to go to the hospital. Gentry testified that because S.G. was not crying, Gentry waited to check S.G.'s hands until they returned home, where Gentry concluded the burns looked like a sunburn, and she gave S.G. Tylenol. Gentry checked the burns a few hours later and applied more aloe gel. A medical witness for the prosecution testified that burns that later are obviously severe initially "can have a variety of appearances," including "where the skin doesn't look like it is injured at all but it is a deep red color," and that applying aloe gel to a less severe burn is not a "bad first thing to do."

Later in the day, Gentry noticed that the burns were beginning to blister. At 4:45 p.m., Gentry and Cardwell took S.G. to the Clark County Emergency Room. Teresa Martin, the triage nurse, testified that S.G. was crying inconsolably, and her hands were bandaged with a dirty shirt. When Martin removed the bandages, she saw skin hanging from S.G.'s fingers. Martin placed S.G.'s hands in cool sterile water and gave her some Tylenol with codeine. Gentry told Martin that she was washing S.G.'s hands and did not realize the water was so hot, and had tried to treat the burns at home. Gentry had also coached S.G. to say that Gentry, not Cardwell, had accidentally caused the burns when washing her hands. Suspicious of Gentry's story, Martin reported S.G.'s burns to the Clark County Department of Child Services.

Because Clark County Hospital does not have a burn unit, S.G. was transferred by ambulance to Kosair Children's Hospital in Louisville, Kentucky. In the emergency room, S.G. was treated by Dr. In K. Kim. Dr. Kim noted that S.G. had partial and full thickness burns on the backs of both hands and was in significant pain. Dr. Kim believed that the burns were very serious and noted that "the skin ha[d] effectively [come] off" and the hands were "de-gloved," raising risks of infection, inflammation, and possible need for skin grafts or amputation. Dr. Kim prescribed a morphine derivative for pain and referred S.G. to the pediatric burn unit.

While S.G. was being treated, Detective Charles E. Thompson of the Jeffersonville Police Department was dispatched to investigate her injuries. Thompson arrived at Kosair Children's Hospital and observed S.G. He testified that S.G.'s "hands were just, some of the worse burns I have seen on a child." Thompson testified that based on his experience, S.G.'s burns were the result of child abuse. At the hospital, Thompson interviewed Gentry, who initially told him that she accidentally caused the burns. After Thompson told her he did not believe her story, she admitted that Cardwell caused the burns.

Thompson then interviewed Cardwell, who took responsibility for what happened to S.G. and expressed deep remorse.[1] Thompson testified that Cardwell admitted planning with Gentry

---

[1] At trial, Thompson recounted his conversation with Cardwell:

> He said that he had taken [S.G.] in [the bathroom] to wash her hands. She began screaming that it hurt, but he kept her hands under there anyway. I said, "so what, you lost it, you totally lost it?" He said, "I wouldn't say I totally lost it," he said "I was mad, I was upset, I had been having problems lately with her minding." He said, "I kept her hands

to have her coach S.G. to lie about who caused the injuries. Thompson also testified that Cardwell explained that to save money he and Gentry had a practice of turning the water heater all the way up just before hot water was needed, and then turning it back down. Gentry testified that she took a bath the evening before S.G. was burned, and she could not remember whether she had turned the water heater back down. Cardwell testified that he did not turn the water heater up before washing S.G.'s hands, and he did not know whether the heater was turned up at the time.

S.G. remained in the pediatric burn unit for a week and continued to receive dressings and pain medication. She also underwent surgery to remove dead tissue from the burns and promote healing. She responded well and did not develop an infection or require skin grafts or amputation.

Cardwell was charged with two counts of neglect of a dependent as a Class B felony under Indiana Code section 35-46-1-4. The first charge alleged that Cardwell, knowingly or intentionally placed S.G. "in a situation that endangered her life or health, by burning her with hot water," resulting in serious bodily injury. The second, as later amended, alleged that Cardwell failed "to seek prompt medical attention for S.G., resulting in . . . severe burns to her hands." Caldwell was also charged with conspiracy to commit perjury as a Class D felony, but that charge was later dismissed. A jury found Cardwell guilty on both counts. The trial court sentenced Cardwell to seventeen years on each count, to be served consecutively for a total sentence of thirty-four years.

Gentry was charged with neglect of a dependent as a Class B felony for failing to obtain prompt medical treatment for S.G.'s burns and with conspiracy to commit perjury as a Class D felony. As with Cardwell, the State dismissed the perjury charge. A jury convicted Gentry of the lesser included offense of neglect of a dependent as a Class D felony, which does not require proof of causing serious bodily injury. Gentry was sentenced to eighteen months in prison. Gentry v. State, No. 10A04-0610-CV-595, slip op. at 4 (Ind. Ct. App. June 26, 2007).

---

under there even though she screamed that it hurt." He said "I am wrong," he said "I need to go to jail and somebody needs to throw away the key."

4

Cardwell appealed his convictions and sentence. In an unpublished memorandum decision, a majority of the Court of Appeals affirmed. Cardwell v. State, No. 10A05-0703-CR-129, slip op. at 2 (Ind. Ct. App. Mar. 13, 2008). Judge Riley dissented in part, reasoning that Cardwell's sentence was inappropriate given the mitigating circumstances. Id. at 18–19. Cardwell seeks transfer only on the sentencing issue, and we granted transfer to address that issue. We summarily affirm the decision of the Court of Appeals on the remaining issues. Ind. Appellate Rule 58(A)(2).

## I. Appellate Review of Sentencing

We have long said that sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. Morgan v. State, 675 N.E.2d 1067, 1072 (Ind. 1996) (citing Sims v. State, 585 N.E.2d 271, 272 (Ind. 1992)). The Indiana General Assembly has codified that approach by substituting advisory sentences for presumptive sentences, providing that the trial court may impose any sentence within the allowable range for a given crime without a requirement to identify specific aggravating or mitigating circumstances. In Anglemyer v. State, 868 N.E.2d 482 (Ind. 2007), we spelled out some of the implications of this change for sentencing by trial courts and for appellate review of sentences. Specifically, we held that:

1. The trial court must enter a statement including reasonably detailed reasons or circumstances for imposing a particular sentence.

2. The reasons given, and the omission of reasons arguably supported by the record, are reviewable on appeal for abuse of discretion.

3. The relative weight or value assignable to reasons properly found or those which should have been found is not subject to review for abuse.

4. Appellate review of the merits of a sentence may be sought on the grounds outlined in Appellate Rule 7(B), [i.e., the sentence is "inappropriate in light of the nature of the offense and the character of the offender"].

Id. at 491.

The first of these is self-explanatory. The second expresses in shorthand the point that appellate courts are to review a number of different sentencing problems using approaches that are generally the same as those followed in appellate review of other factual and legal determinations by trial courts. These problems include reliance on facts that are controverted by the record

or find no support in the record. They also include reliance on facts that, as a matter of law, do not constitute a proper reason to support the conclusion.

The third point, however, gives the trial court a true exercise of discretion. Assigning relative weights to properly found facts often presents issues as to which there are no right or wrong answers. This decision presents merely a range of permissible conclusions, any one of which the trial court may adopt without review by the appellate court. It is discretionary in the same sense that an appointment to public office is at the discretion of the appointing authority. There may be answers that are out of bounds or outright illegal, but within the authorized range, the trial court's resolution is not subject to direct review, except under the fourth principle.

The fourth Anglemyer principle introduces into appellate review an exercise of judgment that is unlike the usual appellate process, and is very similar to the trial court's function under the third Anglemyer principle. See Serino v. State, 798 N.E.2d 852, 856 (Ind. 2003) ("Appellate review of such sentences proceeds on a basis somewhat different from the methods that apply to other issues that typically are the subject of a criminal appeal."). Appellate review of sentencing was authorized by the 1970 amendment to our state constitution, principally to address a perceived unfairness in different sentences imposed for similar offenses. Pruitt v. State, 834 N.E.2d 90, 121 (Ind. 2005). At about the same time, the federal sentencing guidelines addressed the same issue by mechanical application of an array of factors that challenged the Internal Revenue Code for complexity. See Douglas A. Berman, From Lawlessness to Too Much Law? Exploring the Risk of Disparity from Differences in Defense Counsel Under Guidelines Sentencing, 87 Iowa L. Rev. 435, 442–43 (2002) (tracing the development of the original 100 multisection guidelines and 200-page manual which translated into a 9-step process and 258-box grid to arrive at a sentence). After decades of experience with that approach it has now been softened to permit federal judges to exercise more discretion in sentencing. E.g., Gall v. United States, 128 S. Ct. 586, 593, 600 (2007) (upholding district court's 30-month probation sentence under advisory guidelines even though pre-Blakely mandatory guidelines would have required 30-month incarceration).

Indiana has never adopted a mechanical approach to sentencing, and we have not identified any inflexible system that did not raise more problems than it solved. Any effort to force a

sentence to result from some algorithm based on the number and definition of crimes and various consequences removes the ability of the trial judge to ameliorate the inevitable unfairness a mindless formula sometimes produces. We do, however, have the constitutional power to review and revise sentences, and by Appellate Rule 7 have authorized the Court of Appeals to perform the same function. Both courts are to review and revise if a sentence is determined to be "inappropriate in light of the nature of the offense and the character of the offender," a standard leaving much to the unconstrained judgment of the appellate court.

Ultimately the length of the aggregate sentence and how it is to be served are the issues that matter. In the vast majority of cases, whether these are derived from multiple or single counts, involve maximum or minimum sentences, and are concurrent or consecutive is of far less significance than the aggregate term of years. And whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case. Individual judgments as to the proper balance to be struck among these considerations will necessarily vary from person to person, and judges, whether they sit on trial or appellate benches, are no exception. There is thus no right answer as to the proper sentence in any given case. As a result, the role of an appellate court in reviewing a sentence is unlike its role in reviewing an appeal for legal error or sufficiency of evidence. Appellate judges may disagree on these matters, but if they disagree they are usually able to articulate what the disagreement is and why they come out differently. In sentencing review, however, we often resolve the individual case, but do little to provide precedent for the future. In fact, a survey of recent "review and revise" cases shows that we have not adopted a consistent methodology in reviewing sentences. We most frequently review sentences by describing the nature of the offense and character of the offender (13 cases[2]), but sometimes independently assign weights to aggravators and mitigators (5 cases[3])

---

[2] Gauvin v. State, 883 N.E.2d 99, 105 (Ind. 2008); Hollin v. State, 877 N.E.2d 462, 465–66 (Ind. 2007); Reid v. State, 876 N.E.2d 1114, 1116–17 (Ind. 2007); Krempetz v. State, 872 N.E.2d 605, 616–17 (Ind. 2007); McElroy v. State, 865 N.E.2d 584, 592 (Ind. 2007); Salyers v. State, 862 N.E.2d 650, 654 (Ind. 2007); Duncan v. State, 857 N.E.2d 955, 960–61 (Ind. 2006); Hunter v. State, 854 N.E.2d 342, 344 (Ind. 2006); Reyes v. State, 848 N.E.2d 1081, 1082–83 (Ind. 2006); Childress v. State, 848 N.E.2d 1073, 1080–81 (Ind. 2006); Weiss v. State, 848 N.E.2d 1070, 1072–73 (Ind. 2006); Frye v. State, 837 N.E.2d 1012, 1014–15 (Ind. 2005); Laux v. State, 821 N.E.2d 816, 823 (Ind. 2005).

or compare the defendant's sentence to others' or the hypothetical "worst offender" (4 cases[4]). In each of these approaches the explanation is essentially a report of the court's collective sense of what is appropriate, not a product of a deductive reasoning process.

The principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived "correct" result in each case. In the case of some crimes, the number of counts that can be charged and proved is virtually entirely at the discretion of the prosecution.[5] For that reason, appellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.

The circumstances do, however, bear on whether consecutive sentences are appropriate. Whether the counts involve one or multiple victims is highly relevant to the decision to impose consecutive sentences if for no other reason than to preserve potential deterrence of subsequent offenses. Similarly, additional criminal activity directed to the same victim should not be free of consequences. Finally, the nature of the crime can certainly be significant. All of these circumstances must be balanced in view of the fact that the legislature has already built into its sentencing range the consequences to victims, moral revulsion, and other factors inherent in the crime.

## II. Claims of Abuse of Discretion in Cardwell's Sentencing

At the sentencing hearing, Cardwell presented evidence of four mitigating circumstances: the sentence given to Gentry, the hardship a sentence would have on his dependents, his poor eyesight, and his remorse. The trial court found two aggravators, Cardwell's three prior misde-

---

[3] Smith v. State, 889 N.E.2d 261, 263–65 (Ind. 2008); Cotto v. State, 829 N.E.2d 520, 525–26 (Ind. 2005); Neale v. State, 826 N.E.2d 635, 638–39 (Ind. 2005); Houser v. State, 823 N.E.2d 693, 700 (Ind. 2005); Francis v. State, 817 N.E.2d 235, 238–39 (Ind. 2004).

[4] Reid, 876 N.E.2d at 1116–17 (Ind. 2007); Hunter v. State, 854 N.E.2d at 344 (Ind. 2006); Estes v. State, 827 N.E.2d 27, 29 (Ind. 2005); Serino v. State, 798 N.E.2d 852, 857–58 (Ind. 2003).

[5] Child molesting and drug offenses are often in this category because once a single crime is uncovered, it typically proves to be part of a lengthy pattern of activity. But even crimes that factually are isolated events such as murder may be charged in conjunction with multiple other offenses even though if there is only one victim, there will be only one murder. E.g., Redman v. State, 743 N.E.2d 263 (Ind. 2001) (defendant in single-victim incident charged with murder, conspiracy to commit murder, criminal deviate conduct, and confinement).

meanor convictions and S.G.'s young age, and explicitly found no relevant mitigating circumstances. The trial court noted that the evidence supported consecutive sentences, but declined to impose the maximum possible forty-year sentence, finding that Cardwell's offense was not the "worst possible" because he had no prior child abuse convictions, was not on probation, and S.G. suffered no permanent damage.

Cardwell argues that the trial court abused its discretion by not considering evidence of mitigating circumstances. Cardwell is correct that a trial court's failure to find mitigating circumstances clearly supported by the record and advanced for consideration is an abuse of discretion and a proper basis for appellate review. Anglemyer v. State, 868 N.E.2d 482, 490–91 (Ind. 2007). However, none of the circumstances presented by Cardwell are clearly mitigating. No authority requires co-participants to receive proportional sentences. Lopez v. State, 527 N.E.2d 1119, 1133 (Ind. 1988). As to the hardship on his dependents, Cardwell presented evidence that he has five daughters, ages 18, 17, 16, 15, and 2, and that Gentry was eight months pregnant with his child at the time of sentencing. However, testimony of his oldest two daughters suggested that he was not involved with his teenage children. Neither of the two had seen him in the previous year, and they had lived with their grandmother for many years. The trial court may also have properly concluded that the younger children would suffer essentially the same hardship from any significant period of incarceration. See Battles v. State, 688 N.E.2d 1230, 1237 (Ind. 1997) (finding that hardship to five-year-old dependent was not significantly different between forty- and sixty-year sentences). The trial court noted its skepticism about Cardwell's vision problems at the sentencing hearing. Finally, despite Cardwell's frank and self-condemning admission to Detective Thompson on the day of the incident, the trial court was free to question whether Cardwell was genuinely remorseful. See Pickens v. State, 767 N.E.2d 530, 534–35 (Ind. 2002) (noting that determination of remorse is similar to a determination of credibility). Cardwell has not established that the trial court abused its discretion.

### III. Appellate Review and Revision

Cardwell requests review and revision of his sentence under Appellate Rule 7(B). In this case, the trial court's sentence was entirely within the range allowed by statute, Ind. Code §§ 35-50-2-5 (2004) (setting the maximum sentence for a Class B felony at twenty years), 35-50-1-2

9

(providing the trial court with discretion to impose consecutive sentences), and the trial court provided a thoughtful statement of its reasons supporting the sentence. Nevertheless, we think Cardwell's sentence is inappropriate. Accepting the two jury verdicts, the nature of Cardwell's offense is that he intentionally placed a three-year-old's hands under hot water, resulting in very serious burns to both hands, and causing three-year-old S.G. severe pain. He then delayed obtaining medical care. But he also applied aloe gel and bandages to S.G.'s burns, immediately explained the injuries to Gentry, was forthright with Detective Thompson, and accepted responsibility for his actions. S.G. sustained no permanent injuries as a result of these burns. And although Caldwell's convictions are supported by sufficient evidence, we note that his actual knowledge of the water temperature was vigorously contested and that the jury deliberated for a full day before returning guilty verdicts.

As to Cardwell's character, the record contains a number of inconclusive factors on which the trial court made no findings. These include whether Cardwell had previously physically abused S.G., and the quality of his involvement with his younger children. Without findings, we will not consider these factors.

Finally, although Caldwell's sentence is not required to be compared to Gentry's, Cardwell's behavior as to the second count was substantially the same, or even less culpable than Gentry's. Indeed, Cardwell urged earlier attention but Gentry concluded that it was not necessary. Because the lack of medical attention was the product of a second decision, not essentially bound up in the initial crime, we agree that some additional sentence is appropriate. But the disparity between Cardwell's aggregate thirty-four year sentence and Gentry's one and one-half years is stark. Ultimately, the sentence reflects our collective judgment as to the balance of all of these factors. We think the thirty-four years imposed by the trial court is sufficiently out of the range of appropriate results that we should revise Cardwell's sentence to consecutive terms of nine and eight years, for an aggregate sentence of seventeen years.

**Conclusion**

We summarily affirm the opinion of the Court of Appeals regarding Cardwell's convictions. Ind. Appellate Rule 58(A)(2). This case is remanded to the trial court with instructions to

enter a sentence of nine years on the count for burning and eight years on the count for failure to seek medical attention, to run consecutively for an aggregate sentence of seventeen years.

Shepard, C.J., and Sullivan and Rucker, JJ., concur.

Dickson, J., concurs and dissents with separate opinion.

**Dickson, J., concurring and dissenting.**

Although I concur with Part I, discussing the challenges posed by appellate review and revision of criminal sentences, and Part II, finding no abuse of discretion in the trial court's sentencing determination, I decline to join Part III, revising the sentence chosen by the trial court in this case. The Court finds that Cardwell's thirty-four years is excessive for two class B felony convictions for burning his girlfriend's three-year-old daughter with hot water and then failing to seek prompt medical treatment, as compared to the girl's mother's one and one-half year sentence for a single class D felony conviction for failing to seek prompt medical treatment for her daughter. I disagree with the grant of appellate sentence revision in this case.

The determination of the sentence to be imposed in any case primarily derives from the prosecutor's discretion in formulating the charges, the jury's assessment of guilt, the legislature's enactment of the sentencing range deemed appropriate for the criminal offense, and the trial judge's judgment in selecting the sentence to be imposed.

The Court correctly observes that the sentencing decision of a trial court judge is often a matter "as to which there are not right or wrong answers." Slip op. at 6. And, with admirable candor, the Court acknowledges that the appellate review of trial court sentencing decisions leaves much to the "unconstrained judgment of the appellate court," that there is "no right answer as to the proper sentence in any given case," and that appellate courts have not adopted a consistent methodology in reviewing sentences. *Id.* at 7-8.

Presumably reflecting the prosecutorial evaluation of relatively different roles of Cardwell and Gentry, the State did not file identical charges against them.[6] It charged both Cardwell and Gentry with neglect of a dependant as class B felonies for their failure to seek prompt medi-

---

[1] The record of proceedings with respect to Gentry's case is not before this Court, but essential procedural facts are found in the memorandum decision of the Court of Appeals. Gentry v. State, 10A04-0610-CR-595 (Ind. Ct. App. June 26, 2007).

1

cal attention for the girl's injuries.[7]  And it also charged Cardwell with an additional count of neglect of a dependant as a B felony for his placing the child in a life-endangering situation by burning the child with hot water.

A jury declined to convict Gentry of the charged class B felony, but instead convicted her only of a lesser included offense, neglect of a dependent as a class D felony.  Gentry v. State, 10A04-0610-CR-595 (Ind. Ct. App. June 26, 2007).  The sentence imposed for this conviction, one and one-half years, *id.*, was the advisory sentence and within the possible sentencing range of six months to three years for this offense designated by the legislature.  But in Cardwell's case, the jury found him guilty as charged on both counts.  For crimes constituting class B felonies, the legislature has prescribed a sentencing range of six to twenty years imprisonment.  The trial court determined the appropriate sentence to be seventeen years on each count, to be served consecutively, as permitted by law.  And our Court of Appeals reviewed the sentence but declined to find it inappropriate.  Cardwell v. State, 10A05-0703-CR-129 (Ind. Ct. App. March 13, 2008).

Particularly significant here is the thoughtful and detailed eight-page sentencing evaluation for Cardwell by the trial judge who also sentenced Gentry.  In rather transparently discussing and explaining his selection of Cardwell's sentence, the judge carefully describes and evaluates the aggravating and mitigating circumstances, distinguishes between concurrent and consecutive sentencing for these offenses, considers appellate sentencing precedent, specifically declines to merge the offenses for purposes of sentencing, finds that Cardwell does not warrant the maximum sentence, and articulates his reasoning for selecting sentences of seventeen years on each count.  One negative effect of appellate sentence review is that it may serve as a disincentive to such cautious and measured fashioning of sentences by trial judges.  As I have previously noted, "[r]estrained decisions are best made by a trial judge with the gravity that results from knowing that the judge's sentencing decisions are essential final."  Hollin v. State, 877 N.E.2d 462, 466 (Ind. 2007) (Dickson, J., dissenting).

---

[2] The State also charged both Cardwell and Gentry with conspiracy to commit perjury as a class D felony, but later dropped this charge as to each before trial.

2

The Court's decision to reduce Cardwell's sentence is significantly influenced by its consideration of Gentry's sentence and its attempt evaluate their relative culpability. It concludes that the disparity between their aggregate sentences is "stark." Slip op. at 10. This comparative evaluation is difficult, however, because the record before us does not include Gentry's trial and sentencing proceedings, particularly the trial judge's reasons for selecting the advisory sentence for her. And since she did not seek appellate sentence review, we do not have the benefit of any analysis from the Court of Appeals.

In light of the lack of any "right answer" in appellate sentence revision, as acknowledged by the Court, I believe that we should decline to revise the considered judgment of the trial judge in this case, particularly given the significant differences in culpability represented by the different charges filed, the refusal of Gentry's jury to find her guilty of the class B felony, and the trial court's extensive explanation of his reasons for selecting Cardwell's sentence. I would affirm the judgment of the trial court.