**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KRISTINA J. JACOBUCCI**
La Porte, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JAMES B. MARTIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
## COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JIMMY ISBELL, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No.  46A03-1306-CR-203 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LA PORTE SUPERIOR COURT
The Honorable Kathleen B. Lang, Judge
Cause No. 46D01-1101-FA-30

**April 16, 2014**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

## STATEMENT OF THE CASE

Jimmy Isbell ("Isbell") appeals his sentence for Class A felony neglect of a dependent.[1]

We affirm.

## ISSUES

1. Whether the trial court abused its discretion in sentencing Isbell.

2. Whether Isbell's sentence is inappropriate pursuant to Indiana Appellate Rule 7(B).

## FACTS

On January 14, 2011, at about 4:19 P.M., paramedics were dispatched to a house on a report of a child that was sick and vomiting. They arrived at the residence and met Jeffrey Humphrey, who led them down to the basement. Paramedics found Isbell and three boys in the basement. Isbell told the paramedics that one of the boys, four-year-old J.B., had been throwing up. Isbell showed the paramedics a white garbage bag containing vomit mixed with blood. The paramedics noted that J.B. did not appear to be breathing. They took J.B. to the ambulance and observed bruises all over J.B.'s body. The paramedics transported J.B. to the hospital.

Detective Andrew Paul ("Detective Paul") went to the hospital to investigate. Detective Paul learned that J.B. had a bloody and collapsed lung. Doctors later pronounced J.B. dead at 5:05 P.M. An autopsy revealed J.B.'s death to be a homicide

---

[1] Ind. Code §§ 35-46-1-4(a)(1); (b)(3).

due to multiple blunt force trauma. Detective Paul eventually met with Isbell at the police station for an interview.

On three separate occasions, Isbell waived his right to remain silent and gave interviews to Detective Paul at the police station. During the first interview, Isbell stated that J.B.'s injuries were the result of bumping into furniture and being hit by another child. Isbell denied hitting J.B. but admitted that he disciplined J.B. by having him do chores or forcing him to stand in a corner. Isbell said he never took J.B. to the hospital because he did not want people to think that he beat J.B.

During a second interview, Isbell changed his statement and said that he had hit J.B. with a belt five to six times and punched him in the chest because J.B. would not eat. Isbell stated that he grabbed J.B. when he appeared to be vomiting. Isbell stated that when he grabbed J.B.'s arm, J.B. pulled his arm back and fell, hitting his head on a chair and the floor. J.B. laid on the floor for about ten minutes and appeared to be having "a seizure." (App. 114). Isbell attempted to put J.B. in bed and feed him, but J.B. vomited again. Isbell stated that the morning J.B. died, he attempted to feed J.B. again, but J.B. appeared that he would vomit again. Isbell stated that he hit J.B. five or six times on the buttocks and told him not to vomit again. Isbell then told J.B. to stand in a corner. Isbell heard a bump and found J.B. lying "in a trance." *Id.* He said that he waited for J.B. to get better, but finally decided to call an ambulance when J.B. did not "come out of it." *Id.* Isbell told Detective Paul that had he called an ambulance sooner, J.B. may have lived.

3

In a third interview, Isbell attempted to tell Detective Paul that all of J.B.'s injuries were from a fall down the stairs and that he had lied during his previous interviews. However, when police officers questioned J.B.'s brother, the brother stated that Isbell had hit J.B. "one too many times." (App. 133).

On January 18, 2011, the State charged Isbell with two counts of neglect of a dependent as Class A and Class B felonies. The State amended the charging information on January 19, 2011 and added a charge of battery as a Class A felony.[2] On July 28, 2011, Isbell filed a request for a psychological evaluation. The trial court appointed two doctors to evaluate Isbell's competency to stand trial.

On August 23, 2011, Dr. Kumud Aggarwal filed a report stating that Isbell would not be able to assist his attorney at trial. On September 1, 2011, Dr. John T. Heroldt filed a report concluding that Isbell did not "possess the capacity to understand the nature of the court proceedings including the roles of the participants in that process well enough to proceed to trial, and can't assist in his own defense." (App. 246). Both reports focused on Isbell's claim of lack of memory about the charges that led to his arrest. The trial court committed Isbell to the Logansport State Hospital Division of Mental Health and Addiction.

On February 22, 2012, the trial court received a letter certifying the report of staff psychiatrist, Douglas Morris ("Dr. Morris"). The report stated that Isbell had attained the ability to understand the proceedings and assist his attorney in the preparation of a defense. Dr. Morris noted in his report that:

---

[2] Ind. Code § 35-42-2-1(a)(5).

4

[T]ests administered to Mr. Isbell were consistent with exaggeration of both symptoms of mental illness and memory impairment. Although it is likely that some genuine symptoms may exist, the extent and severity of these symptoms could not be assessed at this time due to Mr. Isbell's purposeful attempt to magnify and/or fabricate psychiatric and cognitive symptoms.

(App. 258). Isbell was discharged from the Logansport State Hospital and appeared in court again on April 5, 2012.

On October 24, 2012, Isbell pled guilty to Class A felony neglect of a dependent. Pursuant to the terms of the plea agreement, Isbell's maximum executed sentence could not exceed forty (40) years. The State, in turn, agreed to dismiss the remaining charges concerning J.B. and all charges in four (4) unrelated cases.

The trial court held a sentencing hearing on March 13, 2013. In its sentencing order, the trial court detailed the horrific nature of the injuries inflicted upon J.B. In support of the sentence it imposed, the trial court noted bite marks, contusions to the kidneys, bruising to the liver and thymus, fractures to the ribs, hemorrhaging and swelling in the brain, and significant trauma to J.B.'s head. The trial court noted that Isbell was tasked with the responsibility of caring for J.B., that he failed to immediately seek medical assistance when it was clear J.B. was in distress, and that J.B. had only reached the tender age of four. As mitigating factors, the trial court noted that Isbell pled guilty and "repeatedly expressed remorse for causing [J.B.'s] death." (App. 161). In addition, the trial court specifically noted the following mitigating factors: (1) Isbell suffers from an "extensive history of mental illness and reports that he was sexually abused as a child[;]" and (2) Isbell was overwhelmed with the responsibility of caring for several children. *Id.* After considering all of the evidence and arguments, the trial court

5

concluded that Isbell's crime was "indefensible." *Id*. The trial court sentenced Isbell to forty (40) years with thirty-eight (38) years executed in the Department of Correction and two (2) years suspended to probation. Isbell now appeals his sentence.

DECISION

Isbell argues that the trial court abused its discretion in sentencing him and that his sentence was inappropriate pursuant to Indiana Appellate Rule 7(B). We address each of Isbell's claims separately.

1. Abuse of Discretion in Sentencing

Isbell claims that the trial court abused its discretion during sentencing by: (a) inappropriately considering an aggravating circumstance, and (b) failing to attach any weight to relevant mitigating circumstances.

*a. Aggravating Circumstance*

Isbell contends that the trial court erred when it noted in its sentencing order that "[Mr. Isbell] caused the death of J.B. by what he did and failed to do . . . . [Mr. Isbell] was in a position of care and custody of J.B." (App. 161). Isbell relies on *Stone v. State*, 727 N.E.2d 33, 37 (Ind. Ct. App. 2000) for the proposition that a material element of an offense may not also constitute an aggravating circumstance to support an enhanced sentence. However, we have stated in *Gomillia v. State*, 993 N.E.2d 306 (Ind. Ct. App. 2013), that this statement is no longer an accurate assessment of the law.

In *Gomillia*, we relied on our Indiana Supreme Court's decision in *Pedraza v. State*, 887 N.E.2d 77, 80 (Ind. 2008), when it stated the following:

Indiana sentencing used to be a two-step process—imposing of the presumptive sentence, then deciding whether any aggravators or mitigators warranted deviation. After the 2005 modifications, it consists of only one discretionary determination. Thus, a sentence toward the high end of the range is no longer an "enhanced sentence" in the sense that the former regime provided. Moreover, while the trial court must still list in its sentencing statement those reasons it finds relevant to the sentence, the correlation between those factors and the given sentence is not as precisely tailored as it was under the presumptive sentencing scheme.

Because aggravating circumstances no longer "enhance" a sentence, considering a material element of an offense as an aggravating circumstance can no longer be considered a double enhancement. *See Gomillia*, 993 N.E.2d at 310. Further, our Supreme Court has stated that "the seriousness of the offense . . . which implicitly includes the nature and circumstances of the crime as well as the manner in which the crime is committed, has long been held a valid aggravating factor." *Anglemyer v. State*, 868 N.E.2d 482, 492 (Ind. 2007) (citing *Taylor v. State*, 695 N.E.2d 117, 120 (Ind. 1998)).

Here, the trial court's sentencing order properly considered the facts and circumstances surrounding J.B.'s death. Accordingly, we find no abuse of discretion.

*b. Mitigating Circumstances*

Isbell claims that the trial court abused its discretion in sentencing him because it did not, in his opinion, attach significant weight to the mitigating circumstances. Specifically, Isbell argues that the trial court erred as follows: (1) it failed to give significant weight to his long standing history of mental illness; (2) it failed to find that there were substantial grounds tending to excuse or justify the death of J.B.; and (3) it did not attach significant weight to Isbell's guilty plea or expressions of remorse.

7

The finding of mitigating circumstances is left to the discretion of the trial court. *Legue v. State*, 688 N.E.2d 408, 411 (Ind. 1997). A trial court is not obligated to accept the defendant's assertion of what constitutes a mitigating circumstance. *Id.* In asserting that a trial court failed to find a mitigating circumstance, an abuse of discretion does not occur unless a "sentencing statement omits reasons that are clearly supported by the record and advanced for consideration[.]" *Anglemyer*, 868 N.E.2d at 491. In addition, since the 2005 amendments to Indiana's sentencing statute, trial courts are no longer obligated to "weigh" aggravating and mitigating circumstances to arrive at a sentence. *Id.*

Here, the sentencing statement clearly addressed Isbell's history of mental illness. However, the trial court was under no obligation to consider this mitigating factor in the same manner as Isbell asserts. Again, we find no abuse of discretion in the trial court's sentencing order.

2. Inappropriate Sentence

Isbell claims that his sentence is inappropriate in light of the nature of the offense and his character. He makes no suggestion as to how we should revise his sentence.

Rule 7(B) of the Indiana Rules of Appellate Procedure gives this Court the power to revise an inappropriate sentence in light of the nature of the offense and character of the offender, giving due consideration to the trial court's decision. The defendant must persuade us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Under Rule 7(B), we seek "to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the

8

sentencing statutes, but not to achieve a perceived 'correct' result in each case." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). Whether a sentence is inappropriate ultimately depends upon "the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Id.* at 1224.

In determining whether a sentence is inappropriate, we first look to the advisory sentence provided by statute. *Childres*s, 848 N.E.2d at 1081. The sentencing range for Class A felony neglect of a dependent is between twenty (20) and fifty (50) years, with an advisory sentence of thirty (30) years. I.C. § 35-50-2-4. Here, however, because of the plea agreement negotiated with the State, Isbell faced a maximum sentence of forty (40) years.

As to the nature of the offense, according to the coroner's report, four-year-old J.B. died from multiple blunt force trauma. Specifically, the report detailed the following injuries: fractured ribs; blood clots;[3] contusions to the kidney, liver, and thymus; a lacerated lung; and swelling and hemorrhaging of the brain. The detective on the case observed that the bruising on J.B.'s body was "horrific." (App. 100). After blaming another child for the injuries, Isbell admitted to punching J.B. in the chest, spanking his buttocks, and causing J.B. to fall on his head. With the extent of J.B.'s injuries, Isbell undoubtedly knew that the child required medical attention. When the paramedics found J.B., he was essentially lifeless.

---

[3] The report used the medical term "subcutaneous hematoma." (App. 134).

The State argued the following: "[Isbell] does not, because he cannot, offer any argument as to why his sentence is inappropriate with respect to the nature of his offense." (State's Br. 15). We agree. It is of no small consequence that Isbell chose not to argue that his sentence was inappropriate in light of the nature of the offense. Given the brutal manner in which J.B. perished and the fact that Isbell did not receive the maximum executed sentence possible from the trial court, Isbell cannot persuade us that the nature of the offense makes his sentence is inappropriate. Because Isbell cannot convince us that his sentence is inappropriate in light of both the nature of the offense and his character, his 7(B) argument fails.

Affirmed.

MATHIAS, J., and BRADFORD, J., concur.