# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 10 2018, 9:12 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Ball Eggleston, PC
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jonathan M. Fuchs, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | October 10, 2018 <br><br> Court of Appeals Case No. 18A-CR-271 <br><br> Appeal from the Tippecanoe Superior Court <br><br> The Honorable Steven Meyer, Judge <br><br> Trial Court Cause No. 79D02-1610-F1-17 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jonathan Fuchs (Fuchs), appeals his conviction for one Count of child molesting, as a Level 1 felony, Ind. Code § 35-42-4-3(a); and one Count of child molesting, as a Level 4 felony, I.C. § 35-42-4-3(b).

We affirm.

# ISSUES

Fuchs presents two issues on appeal, which we restate as the following:

(1) Whether the State presented sufficient evidence beyond a reasonable doubt to support Fuchs' convictions; and

(2) Whether Fuchs' aggregate sentence is inappropriate in light of the nature of the offenses and his character.

# FACTS AND PROCEDURAL HISTORY

In 2016, B.S. (Mother), her boyfriend (Boyfriend), and her four children, including seven-year-old K.S., resided in a four-bedroom house in Tippecanoe County, Indiana. The biological father to Mother's children is M.S. (Father), and Mother and Father have "a split custody schedule." (Transcript Vol. II, p. 123). Father resides with his long-term girlfriend (Girlfriend), and when the children visit, Girlfriend cares for them.

Fuchs and Mother are friends. In the summer of 2016, Fuchs would visit Mother's house, and K.S. encountered Fuchs during those visits. That same

summer, Fuchs moved into Mother's home and began renting the blue bedroom. Fuchs appears to have groomed K.S. by buying K.S. toys and clothes, taking him to restaurants, and playing with him in the house. One time when K.S. was in Fuchs' bed "in the blue bedroom," Fuchs placed his hands on K.S.' penis and also used his "mouth" to suck K.S.' "private part." (Tr. Vol. II, p. 79). On another occasion, while K.S. was in his bedroom, Fuchs led K.S. into the closet where he pulled down his pants and showed his penis to K.S. According to K.S., Fuchs' "private area . . . had red dots and black hair." (Tr. Vol. II, p. 81). After showing his penis to K.S., Fuchs pulled down K.S.' pants and "used his hands . . . to hold [K.S.'] private part." (Tr. Vol. II, p. 83). Fuchs advised K.S. to keep his actions "secret." (Tr. Vol. II, p. 86). K.S. indicated that when the molestations occurred, Mother, Boyfriend, and his siblings, were all present at the house; however, "they were probably downstairs." (Tr. Vol. II, p. 88).

[6] On October 13, 2016, while K.S. and his siblings were at Father's and Girlfriend's house, Girlfriend initiated a conversation with the children "about body safety." (Tr. Vol. II, p. 97). Girlfriend advised the children that "if someone were to touch them" in their "private area," they should report the incident. (Tr. Vol. II, pp. 97, 98). After her talk, Girlfriend observed K.S.' "facial expression" change, and K.S. "looked like he [had] just" seen "a ghost." (Tr. Vol. II, p. 99).

[7] On October 14, 2016, the next day, Father and Girlfriend took K.S. to the Tippecanoe County Sherriff's Department, but they were referred to the

Heartford House, a child advocacy center, for a forensic interview. After the interview, Father took K.S. to Riley Children's Hospital for a sexual assault examination.

[8] On October 17, 2016, Detective Matthew Budreau (Detective Budreau) executed a search warrant at Mother's home. Detective Budreau informed Fuchs that he was investigating claims of child molesting. Fuchs agreed to be questioned and drove himself to the sheriff's department. After he was read his *Miranda* rights, Fuchs stated that he loved and cared for K.S., and at times, he would go to K.S.' bedroom to play with him, and he often helped K.S. build a "fort" in the closet. (State's Exh. 1R. at 15:00). He added that he would also "snuggle" with K.S. at bedtime. (State's Exh. 1R at 06:35). While Fuchs consistently denied any inappropriate sexual contact with K.S., he stated that he frequently bathed K.S., and one time, he accidently "touched" K.S.' penis, while dressing K.S. (State's Exh. 1R at 06:35).

[9] On October 24, 2016, the State filed an Information, charging Fuchs with Count I, child molesting, a Level 1 felony; Counts II, III, and IV, child molesting, Level 4 felonies; and Count V, child solicitation, a Level 5 felony. A three-day jury trial was conducted on November 14 through November 16, 2017. At the close of the State's evidence, Fuchs moved for a directed verdict on Counts III through V, which the trial court granted. Thereafter, the jury returned guilty verdicts for Count I, Level 1 felony child molesting, and Count II, Level 4 felony child molesting. On January 8, 2018, the trial court sentenced Fuchs to the Department of Correction to serve thirty-four years on Count I, a

consecutive term of eight years on Count II, for an aggregate sentence of forty-two years, however, the trial court suspended ten years of his aggregate sentence to probation.

Fuchs now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

Fuchs claims that there was insufficient evidence to convict him of one Count of child molesting as a Level 1 felony and one Count of child molesting as a Level 4 felony. When reviewing a claim of insufficient evidence, it is well established that our court does not reweigh evidence or assess the credibility of witnesses. *Walker v. State*, 998 N.E.2d 724, 726 (Ind. 2013). Instead, we consider all of the evidence, and any reasonable inferences that may be drawn therefrom, in a light most favorable to the verdict. *Id*. We will uphold the conviction "'if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.'" *Id*. (quoting *Davis v. State*, 813 N.E.2d 1176, 1178 (Ind. 2004)).

To convict Fuchs of Level 1 felony child molesting as charged, the State was required to prove beyond a reasonable doubt that Fuchs, a person of at least twenty-one years of age, knowingly or intentionally performed other sexual conduct with K.S., a child under fourteen years of age. I.C. § 35-42-4-3(a). Other sexual conduct includes "an act involving . . . a sex organ of one (1)

person and the mouth . . . of another person." I.C. § 35-31.5-2-221.5. As for Fuchs' Level 4 felony child molesting conviction, the State was required to establish that he, "with a child under fourteen (14) years of age, perform[ed] or submit[ted] to any fondling or touching, of either [K.S. or himself], with intent to arouse or to satisfy the sexual desires of either [K.S. or himself.]"  I.C. § 35-42-4-3(b). On appeal, Fuchs challenges the identification evidence, arguing that K.S. was unable to state whether he was present in the courtroom.

[13]  At Fuchs' trial, referring to Fuchs by his first name—*i.e.*, Jonathan—the State asked K.S. the following questions

> Q.  And do you know a person named Jonathon [sic] Fuchs? . . .
>
> A.  Yes.
>
> * * *
>
> Q.  Okay.  Now how do you know Jonathon [sic] Fuchs?
>
> A.  Well I met him first thing whenever he came over at our house.
>
> Q.  And, whose house was that?
>
> A.  My mom's.
>
> Q.  And do you see the person you know as Jonathon Fuchs sitting in the courtroom today?

A.  No, not right now.

Q.  Okay.  Now, did Jonathon, when Jonathon lived at your mom's house, what color bedroom did he stay in?

A.  A blue one.

(Tr. Vol. II, p. 77).  Based on K.S.' response that he could not state whether Fuchs was present in the courtroom, Fuchs posits that the evidence was insufficient to support his child molesting convictions.  In advancing his claim, Fuchs relies on *J.Y. v. State*, 816 N.E.2d 909 (Ind. Ct. App. 2004), *trans. denied*.

[14]  In *J.Y.,* the victim, an African-American eight-year-old girl, was riding her bike in the alley behind her house in South Bend, Indiana, when she encountered two Caucasian, teenage boys who were brothers.  *Id.* at 911.  One or both of the boys forced the victim into a van parked off of the alley.  *Id.*  Inside the van, the younger brother removed the victim's clothes, began to rub his penis on the outside of the victim's vagina, and ejaculated onto her abdomen and the van's seat cushion.  *Id.*  During that time, the older brother was standing right outside the van.  *Id.*  When the younger brother exited the van, the older brother entered the van and began rubbing his penis on the outside of the victim's vagina.  *Id.*  The victim shouted out "No!," and the boy stopped without ejaculating.  *Id.*  The victim then exited the van and went home.  *Id.*  During an interview, the victim described the boys as Caucasian, teenage brothers, one of whom she thought was named Michael.  *Id.*  The police determined that three Caucasian, teenage brothers—T.Y., J.Y., and C.L.Y.—lived in the house

behind which the van was parked. *Id.* at 912. The police compiled a photo array consisting of six pictures, three of which were photos of the brothers. *Id.* The victim identified J.Y. and C.L.Y. from the array. *Id.* The police also located two semen stains in the van. *Id.* DNA testing revealed that C.L.Y. was the source of the semen. *Id.* The State subsequently filed delinquency petitions against J.Y. and C.L.Y., alleging two Counts of child molesting, one as a Class B felony and one as a Class C felony when committed by an adult. *Id.* At the factfinding hearings, the victim was not able to identify J.Y. or C.L.Y. as her assailants in court. *Id.* However, she was able to testify that they lived in a green house, and she identified a photograph of their house. *Id.* At the close of the evidence, J.Y. and C.L.Y. were adjudicated as delinquents. *Id.* J.Y. and C.L.Y. filed separate appeals.

[15] In J.Y.'s appeal, we determined that the photo array was impermissibly suggestive because there were remarkable differences in appearance between J.Y. and his brothers and the other three boys, including their clothing and demeanor, and the difference in the quality and composition. *Id.* at 915. As such, we concluded that the juvenile court abused its discretion when it permitted the victim's out-of-court identification of J.Y. into evidence. *Id.* Further, we found that the remaining evidence, including the fact that the victim had been unable to state whether J.Y. and C.L.Y. were present in the court room and the DNA evidence of the semen which only supported a reasonable inference that J.Y. *could have been* one of the two boys who might have committed the offense, was insufficient to prove that J.Y. was one of the

perpetrators. *Id*. at 916-17. Therefore, we reversed the adjudication of J.Y. as a delinquent.

[16] In C.L.Y.'s appeal, however, we reached a different conclusion. Specifically, we determined that even if the suggestive photo array was not considered, the victims' description of the perpetrators and their house, along with the presence of C.L.Y.'s semen in the van, was sufficient to prove that C.L.Y. was one of the perpetrators. *C.L.Y. v. State*, 816 N.E.2d 894, 904 (Ind. Ct. App. 2004), *trans. denied.*

[17] Relying on the holding espoused in *J.Y.*, Fuchs then argues

> The same result is required in this case. Although it is true that K.S. used Fuchs's name at trial, it was done first at the prompting of the deputy prosecuting attorney. [] Most importantly, K.S. testified that the person K.S. referred to as "Jonathan" was not present in the courtroom. [] The State made no other effort to ask K.S. whether the perpetrator was present in the courtroom, or to ask K.S. for a physical description of the perpetrator.

(Appellant's Br. pp. 14-15).

[18] Turning to the present facts, we find *J.Y.* easily distinguishable and *C.L.Y.* more persuasive to the facts at hand. Unlike *J.Y.* and similar to *C.L.Y.*, the State presented other corroborating evidence of Fuchs' identity, and additional evidence connecting Fuchs to the crimes in question. During his interview with the police, Fuchs claimed that before he moved in at Mother's house, he would visit frequently, and sometimes, he would spend the night. Prior to K.S.'

testimony that he was unable to locate Fuchs in the courtroom, K.S. stated that he first encountered "Jonathan Fuchs . . . whenever he came over at our house." (Tr. Vol. II, p. 77). K.S. indicated that the house he was referring to was Mother's home, and that Fuchs occupied the blue bedroom after moving in. Mother corroborated K.S.' testimony.

[19] During his interview with the police, Fuchs stated that while he lived at K.S.' house, he would sometimes "snuggle" with K.S., and also play with K.S. either in his bedroom or in K.S.' bedroom closet building fortresses. (State's Exh. 1R at 06:35). Additionally, Fuchs stated that he helped K.S. with his baths and would use a wash cloth to clean K.S.' penis. Notwithstanding Fuchs' claim that K.S. needed help with his baths, Mother testified that K.S. "could do most of . . . his bathing by himself" and "only needed help rinsing." (Tr. Vol. III, p. 33). Mother then testified that she was not always present when Fuchs provided care for K.S.

[20] When the State showed K.S. drawings of the front and back sides of a boy and asked K.S. to circle the body part which he was referring to as his private part, K.S. circled the boys' genitalia. When asked to detail the events that occurred in the blue bedroom, K.S. testified that while he was under the blanket "in Jonathon's [sic] bedroom," Fuchs sucked his private part. (Tr. Vol. II, p. 80). K.S. additionally stated that at another instance, Fuchs led him to his bedroom closet and revealed his penis to him. When asked "whose idea was it for you to see [Fuchs'] private part in the closet," K.S. responded, "Jon's." (Tr. Vol. II, p. 82). K.S. described Fuchs' genitalia having "red dots and [] black hair," (Tr.

Vol. II, p. 81). After Fuchs exposed his penis to K.S., he proceeded to pull down K.S.' pants and then he touched K.S.' penis. K.S. indicated that his entire family was "probably downstairs" when the incidents occurred. (Tr. Vol. II, p. 88). K.S. also testified that Fuchs requested him to keep his actions "secret." (Tr. Vol. II 86). However, when he finally disclosed the molestation to Girlfriend, he "knew it was the right thing to do." (Tr. Vol. II, p.92).

[21] Here, we find that this is not a case in which the only evidence linking the assailant to the scene was the victim's use of assailant's first name, as occurred in *J.Y.* Notwithstanding K.S.' inability to state if Fuchs was present in the courtroom, the State offered extensive corroborating evidence of probative value regarding the identity of Fuchs. K.S. testified that he knew Fuchs before he moved into Mother's home, and after Fuchs moved in, Fuchs occupied the blue bedroom. Indeed, Girlfriend testified that Fuchs was the "only Jonathan Fuchs" that K.S. knew at the relevant time period, and following the body safety talk, K.S. disclosed to her that Fuchs had molested him. (Tr. Vol. II, p. 101).

[22] The State also presented evidence that Fuchs was able to spend time alone with K.S., which provided Fuchs with the opportunity to commit the crimes. In light of the foregoing, we conclude that there was sufficient corroborating evidence of probative value regarding the identity of Fuchs to convict Fuchs of one Count of child molesting as a Level 1 felony, and one Count of child molesting as a Level 4 felony.

## II. *Inappropriate Sentence*

[23] Fuchs also contends that his sentence is inappropriate in light of the nature of the offenses and his character. Indiana Appellate Rule 7(B) empowers us to independently review and revise sentences authorized by statute if, after due consideration, we find the trial court's decision inappropriate in light of the nature of the offense and the character of the offender. *Reid v. State*, 876 N.E.2d 1114, 1116 (Ind. 2007). The "nature of offense" compares the defendant's actions with the required showing to sustain a conviction under the charged offense, while the "character of the offender" permits a broader consideration of the defendant's character. *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008); *Douglas v. State*, 878 N.E.2d 873, 881 (Ind. Ct. App. 2007). An appellant bears the burden of showing that both prongs of the inquiry favor a revision of his sentence. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Whether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other considerations that come to light in a given case. *Cardwell*, 895 N.E.2d at 1224. Our court focuses on "the length of the aggregate sentence and how it is to be served." *Id*.

[24] The advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Abbott v. State*, 961 N.E.2d 1016, 1019 (Ind. 2012). For his Level 1 felony child molesting, Fuchs faced a sentencing range of twenty to forty years, with the advisory sentence being thirty years. I.C. § 35-50-2-4. The trial court sentenced Fuchs to thirty-four

years. For his Level 4 felony child molesting conviction, Fuchs faced a sentencing range of two to twelve years, with the advisory sentence being six years. I.C. § 35-50-2-5.5. The trial court sentenced Fuchs to a consecutive eight-year term, for an aggregate sentence of forty-two years, with ten years were suspended to probation.

[25] Turning to the nature of his offenses, in the summer of 2016, Fuchs moved into Mother's home. During his interview with the police, Fuchs claimed that while residing at Mother's home, he assumed a caregiving role to K.S. and K.S.' siblings. Indeed, Mother had no reservations leaving K.S. and her other children in the care of Fuchs. In a span of two months, Fuchs appears to have groomed K.S. by buying him toys, taking him to restaurants, playing video games with him, and building forts in the bedroom closet. After Fuchs gained K.S.' trust, he began molesting him. One time when K.S. was in Fuchs' bedroom, Fuchs pulled down K.S.' pants and used using his mouth to perform oral sex on K.S. K.S. also described another incident where Fuchs led him to the closet, where Fuchs revealed his penis to him, and thereafter Fuchs touched his penis.

[26] Concerning the character of the offender, Fuchs claims that he "has a strong work history," has maintained "steady employment ever since graduating high school," has "contributed to his community, volunteering as a soccer coach for many years," and "[p]erhaps most importantly, [he] has *absolutely no criminal history*." (Appellant's Br. pp. 17-18) (italics in original). While fashioning Fuchs' sentence, the trial court considered all these mitigating factors; however,

the trial court was "troubled" by the fact that Fuchs abused his position of trust with K.S. by molesting a vulnerable child. who was autistic and had behavioral problems. Fuchs' acts of molesting a young child over whom he had a position of trust reflects poorly on his character, and that fact does not convince us that his sentences are inappropriate.

[27] Fuchs further argues that the trial court's imposition of consecutive sentences was inappropriate. The decision to impose consecutive sentences lies within the discretion of the trial court. *Gross v. State*, 22 N.E.3d 863, 869 (Ind. Ct. App. 2014), *trans. denied*. A trial court is required to state its reasons for imposing consecutive sentences. *Id*. Moreover, a single aggravating circumstance may justify the imposition of consecutive sentences. *Gilliam v. State*, 901 N.E.2d 72, 74 (Ind. Ct. App. 2009). Here, the trial court found not just one, but a number of aggravating circumstances, including the fact that Fuchs was aware that K.S. had autism and behavioral problems; Fuchs held a position of trust with K.S. when he molested K.S.; and the overall seriousness of his crimes.

[28] Fuchs contends that his case compares favorably to *Rivers v. State*, 915 N.E.2d 141, 143 (Ind. 2009), where Rivers was convicted of two Counts of Class A felony child molesting and one Count of Class C felony child molesting for molesting his seven-or-eight-year-old niece on two occasions. The trial court imposed consecutive thirty-year, advisory terms for the Class A convictions and a concurrent four-year term on the Class C felony conviction for a total of sixty years. *Id*. The supreme court, in examining Rivers' character, noted that he

had no criminal history, maintained steady employment, and served as a father figure to the victim for a number of years before committing his crimes. *Id*. The victim also testified "that her relationship with Rivers was good and that the two of them did a lot of family activities together prior to his crimes." *Id*. Regarding the nature of the offenses, our supreme court noted that "[t]he record does not indicate his crimes occurred over a long period of time, however, or that there was any other sexual misconduct on Rivers' part. Rather, the record indicates Rivers molested [the victim] on two occasions (charged as three) in a relatively short period of time. . . ." *Id*. at 144. As such, the supreme court concluded that Rivers' convictions should run concurrently rather than consecutively. *Id*.

[29] In exercising our power to review and revise sentences, we may compare sentences of those convicted of the same or similar offenses, although such comparison is not required. *Corbally v. State*, 5 N.E.3d 463, 471-72 (Ind. Ct. App. 2014). Although the defendant in *Rivers*, like Fuchs, did not commit the crimes over a long period of time, did not commit any other sexual misconduct, and only molested his victim on two occasions, Fuchs did not stop on his own accord. *See Rivers*, 915 N.E.2d at 144. The defendant in *Rivers* molested his victim twice and stopped, with no other occurrence for seven years; whereas, Fuchs was prevented from committing another offense after K.S. disclosed the molestations to Girlfriend and a police investigation ensued. Here, we conclude that the trial court did not abuse its discretion in imposing consecutive

sentences. In sum, we conclude that Fuchs' aggregate term of forty-two years is not inappropriate in light of the nature of the offenses and his character.

# CONCLUSION

Based on the foregoing, we conclude that there was sufficient evidence to sustain Fuchs' convictions, and his sentence is appropriate in light of the nature of the offenses and his character.

Affirmed

Vaidik, C. J. and Kirsch, J. concur