## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 17 2015, 9:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Patricia Caress McMath
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Dontee Robinson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

April 17, 2015

Court of Appeals Case No.
49A02-1407-CR-447

Appeal from the Marion Superior Court
The Honorable Lisa Borges, Judge
Cause No. 49G04-1211-MR-080844

**Bailey, Judge.**

# Case Summary

[1] Dontee Robinson ("Robinson") was convicted by a jury of Murder, a felony;[1] Attempted Murder, a Class A felony;[2] Robbery, as a Class B felony;[3] and Criminal Confinement, as a Class B felony.[4] Robinson was sentenced to an aggregate term of imprisonment of 140 years. In this appeal, he raises for our review only whether his sentence is inappropriate under Appellate Rule 7(B).

[2] We affirm.

# Facts and Procedural History

[3] Robinson and several of his acquaintances, Dominique Hamler ("Hamler"), James McDuffy ("McDuffy"), Nathaniel Armstrong ("Armstrong"), Carlton Hart ("Hart"), and Darin Jackson ("Jackson"), were involved in the rap music scene in Indianapolis. In November 2012, a rap musician nicknamed "Bango," who was a close friend of Hamler, was murdered.

[4] McDuffy had heard that a local DJ named Thomas Keys ("Keys") was involved with Bango's death. A phone call was made to Keys on the pretense

---

[1] Ind. Code § 35-42-1-1. Indiana's criminal statutes were revised in 2013 and 2014; we refer to statutory provisions governing the substantive offenses and sentencing for offenses in effect at the time of Robinson's offenses.

[2] I.C. §§ 35-41-5-1 & 35-42-1-1.

[3] I.C. § 35-42-5-1.

[4] I.C. § 35-42-3-3.

that Keys would help mix tracks for a tribute to Bango at the One Stop Media studio, a recording studio Hart owned that was located near 46th Street and Keystone Avenue in Indianapolis.

[5] Keys's cousin, Marvin Finney, II ("Finney"), had been learning to do DJ work as well, and on November 15, 2012, Keys asked Finney to come with him to work on mixing the tracks. Finney drove in his mother's rented minivan to Keys's apartment around 4:00 that afternoon, and the two men drove to the One Stop Media studio.

[6] Upon arriving at the studio, Keys called to let the studio know he was there. Keys and Finney entered the studio; the back door of the studio had been locked in place with brackets and a wooden plank. Robinson was present at the scene, and Finney recognized him as a local rapper named "D-Rob." Finney also recognized McDuffy, who was also present when he and Keys entered the studio.

[7] Once in the studio, Robinson and McDuffy began to interrogate the two men about who had killed Bango; the questioning focused on Keys, but questions were asked of Finney, as well. Finney attempted to stay out of the discussion and was using his cellular phone to send text messages. McDuffy demanded to know who Finney was messaging with, and Finney showed McDuffy the phone.

[8] While talking to Finney, McDuffy pulled out a semiautomatic pistol with a laser sight; McDuffy laid the gun on his lap as he asked questions of Keys and

Finney. At some point during the questioning, Robinson pulled out an assault rifle that he held during portions of the interrogation. Throughout the questioning, Keys and Finney denied any knowledge of who had been involved in Bango's death.

[9] Finney began to ask Keys what was going on; to make sure neither Keys nor Finney had a gun, Robinson patted down Keys, and McDuffy patted down Finney. Robinson and McDuffy took Keys's and Finney's belongings, including wallets, a food assistance card, cash, keys to Finney's mother's van, and Finney's laptop computer. McDuffy then began the questioning anew, telling the men to "tell us or you're not going home." (Tr. at 145.) Finney tried to move toward the back door in order to escape, but a third individual who had been pacing near the back door came in and held a revolver to Finney to keep him in place. McDuffy then ordered Keys and Finney to remove their clothes and ordered that Keys and Finney be restrained.

[10] As McDuffy continued to ask questions, Hamler entered the studio; Finney recognized Hamler as a local rapper called "Scooter." Hamler was angry, and upon entering the studio he retrieved an assault rifle he had been hiding in a pants leg. Hamler, loud and upset, demanded to know who had killed Bango and who Finney was; Finney explained that he was just there to work on music.

[11] Keys and Finney were ordered to get on the ground; Finney resisted, and McDuffy and Hamler punched him down. Keys and Finney were then restrained with zip ties. The men explained that they were doing this for

Bango, because someone "had to pay" for his death. (Tr. at 153.) The men also said that while Finney had nothing to do with Bango, he should not have come.

[12] At around this time, a fifth person, later identified as Armstrong, entered the studio. Armstrong was loud, aggressive, and spoke openly about killing Keys and Finney. Armstrong was armed with a boxcutter-like knife, and asked which of the two bound men was Keys. Armstrong was directed to Keys, and slashed Keys's leg with the knife, causing Keys to scream in pain. Armstrong and Hamler both said that they did not care whether Keys and Finney had any involvement with Bango's murder: they were doing this "for Bango" and someone "had to pay." (Tr. at 158.)

[13] Armstrong then told Finney and Keys to "shut up," and McDuffy ordered Keys's and Finney's mouths taped with duct tape. (Tr. at 158.) One of the five men in the studio began talking about getting gloves to "finish … off" Keys and Finney. (Tr. at 159.) A sixth man with a bald head, whose identity was unknown to Finney but who was later identified as Hart, entered the studio through the back door. Upon being shown Keys and Finney, Hart confirmed Keys's identity.

[14] Throughout this, Finney's cellular phone, which had been taken along with his other property, continued to receive text messages from friends and relatives. At some point, Hamler told Finney that his girlfriend would be mad at him because she had continued to call, and Finney had not answered. Soon after

this, Finney's mother sent a text message demanding that Finney return the van and threatening to call the police. Hamler asked if that would really happen, and both Finney and Keys indicated that Finney's mother would actually call the police.

[15] This information prompted Robinson, Hamler, Armstrong, and Hart to leave the room to put on gloves. The lights in the studio were turned off, but the room remained illuminated by a computer. McDuffy and another man remained in the room; McDuffy tapped a gun on Finney' head, telling him to say anything he knew about Bango's death. McDuffy also told Keys and Finney that they would be killed as soon as the businesses in the area had closed. Keys continually apologized to Finney for getting him involved in the matter.

[16] At some point, all six men came back in the studio room. They continued to talk among themselves, breaking into smaller groups at times, and began to play some of Bango's music. The men talked about how Bango was about to sign a contract with a record label, and how they were doing this for Bango. During this conversation, Hart speculated about ways in which they might kill Keys and Finney, including burning them alive and shooting them.

[17] Armstrong told someone to get more zip ties. A zip tie was placed on Keys's neck, and another one was placed on Finney's neck; the ties were sufficiently tight that Finney thought he might suffocate. Armstrong told someone to put

tape on Keys's eyes so that Keys would not see what was about to be done to him. All six men then left the studio room.

[18] One of the men, who had dreadlocks in his hair and was wearing dark clothes, but whom Finney was unable to clearly identify, returned to the door of the studio, pointed a gun at Keys and Finney, and began shooting at them. Finney ducked his head, tried to protect himself by putting his hands in the air, and was shot in the wrists on both arms. Keys was shot multiple times, screamed and shook for a brief period of time, and fell silent.

[19] Finney "played dead" until he thought it might be safe to leave. (Tr. at 169.) He jumped up and managed to break his legs free of the ties on them. Finney located a screwdriver in the studio and managed to break his hands free of the zip ties, but even after finding scissors he was unable to remove the zip tie that had been tightened around his neck. Finney tried to rouse Keys, but was unable to do so.

[20] Because the six men had left the studio through its back door, the block that had been used to secure that door was no longer in place; Finney put the block back in the door in order to prevent the men from returning. Finney remembered that there was a CVS drug store nearby, and ran there, still shoeless. After flagging people down at the CVS, Finney was able to get the zip tie removed from his neck. One of the customers at CVS called 911; police arrived and commenced an investigation, during which Finney identified Robinson, Armstrong, and Hamler as having been at the studio.

[21] As a result of the ensuing investigation, on November 29, 2012, Robinson was charged with two counts of Murder; Kidnapping, as a Class A felony;[5] Attempted Murder; Robbery, as a Class A felony; Criminal Confinement; Conspiracy to Commit Kidnapping, as a Class A felony;[6] and Conspiracy to Commit Criminal Confinement, as a Class B felony.[7] The State also alleged that Robinson engaged in Murder, Kidnapping, and Criminal Confinement in connection with criminal gang-related activity, and sought a related sentencing enhancement.[8]

[22] A jury trial was conducted from October 21 to 24, 2013; the jury could not reach a unanimous verdict, and a mistrial was declared.

[23] Robinson and Hamler were subsequently retried jointly from May 12 to May 14, 2014, again before a jury. Just prior to commencement of the trial, the State dismissed the charges of Kidnapping and Attempt to Commit Kidnapping. During the trial, the State also dismissed the allegation related to the criminal gang activity enhancement. At the conclusion of the trial, Robinson was found guilty of all the remaining charges.

---

[5] I.C. § 35-42-3-2.

[6] I.C. §§ 35-41-5-2 & 35-42-3-2.

[7] I.C. §§ 35-42-5-2 & 35-42-3-3.

[8] I.C. § 35-50-2-15.

[24] On June 4, 2014, a sentencing hearing was conducted. During the sentencing hearing, the trial court "merged" several of the offenses into other charges and entered judgments of conviction against Robinson for Murder, Attempted Murder, Robbery, and Criminal Confinement. The trial court also reduced the classification of the Robbery charge from a Class A felony to a Class B felony. At the conclusion of the sentencing hearing, the trial court sentenced Robinson to consecutive terms of sixty-five years imprisonment for Murder, fifty years imprisonment for Attempted Murder, ten years imprisonment for Robbery, and fifteen years imprisonment for Criminal Confinement.

[25] This appeal ensued.

# Discussion and Decision

[26] Robinson raises for our review only whether his sentence is inappropriate. The State contends that Robinson has waived his appeal of this matter.

[27] The authority granted to this Court by Article 7, § 6 of the Indiana Constitution permitting appellate review and revision of criminal sentences is implemented through Appellate Rule 7(B), which provides: "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Under this rule, and as interpreted by case law, appellate courts may revise sentences after due consideration of the trial court's decision, if the sentence is found to be

inappropriate in light of the nature of the offense and the character of the offender. *Cardwell v. State*, 895 N.E.2d 1219, 1222-25 (Ind. 2008); *Serino v. State*, 798 N.E.2d 852, 856-57 (Ind. 2003). The principal role of such review is to attempt to leaven the outliers. *Cardwell*, 895 N.E.2d at 1225.

[28] We turn first to the State's contention that Robinson waived his appeal as to the inappropriateness *vel non* of his sentence. The State argues in essence that Robinson did not make any argument concerning the nature of his offense, where our standard under Rule 7(B) looks at both the nature of the offense and the offender's character, and thus Robinson has waived the entirety of his sentencing challenge.

[29] We disagree. Robinson's brief concedes that the nature of his offense is not a matter of argument and is among the most egregious of offenses. That is by no means a waiver of the entirety of the appeal, however, as Robinson's argument is that his character renders his sentence inappropriate. And even were that not the case, Indiana's courts have a long-stated policy to prefer to resolve cases on their merits when possible. *Welch v. State*, 828 N.E.2d 433, 436 (Ind. Ct. App. 2005). We accordingly decline the State's invitation to consider Robinson's appeal as waived, and turn to the merits of Robinson's appeal.

[30] Robinson was convicted of Murder, a felony; Attempted Murder, as a Class A felony; Robbery, as a Class B felony; and Criminal Confinement, as a Class B felony. Murder carried a sentencing range of forty-five to sixty-five years, with an advisory term of fifty-five years, I.C. § 35-50-2-3; Robinson was sentenced to

the statutory maximum term. For his Attempted Murder conviction, Robinson faced a possible sentencing range of twenty to fifty years, with an advisory term of thirty years, I.C. 35-50-2-4(a); he received the statutory maximum sentencing term of fifty years. For Robbery and Criminal Confinement, each as Class B felonies, Robinson faced a term of imprisonment for each of between six and twenty years, with an advisory term of ten years. I.C. § 35-50-2-5(a). He received an advisory sentence of ten years for his Robbery conviction, and a sentence of fifteen years imprisonment for his Criminal Confinement conviction. The trial court ran all these sentences consecutively to one another, yielding an aggregate term of imprisonment of 140 years.

[31] As we noted above, Robinson concedes that the nature of his offense was of the most egregious nature. He participated in a premeditated and planned scheme to trap, interrogate, injure, rob, and ultimately kill Keys. He, along with his co-defendants, did not release Finney when they learned he had nothing to do with any of the events related to Bango's murder. Instead, Robinson remained present and armed during the events of November 15, 2012, and continued over the course of nearly three hours to participate in the offenses committed upon both Keys and Finney, including their detention, robbery, beating, and shooting. Robinson had ample opportunity during all this to leave; he did not.

[32] Keys and Finney were both injured and terrorized during these events, and their families continue to suffer as a result of Robinson's offenses. Keys's children were left without a father, and Keys's parents continued to be traumatized. So, too, was Finney; Finney's mother testified during the sentencing hearing that

Finney continued to experience nightmares, no longer mentioned Keys during conversation, and simply was no longer "normal." (Tr. at 628.)

[33] As to his character, Robinson concedes that he has a criminal history and lacks education. However, Robinson argues that his young age, employment history, and financial support for his young child and his grandmother make his sentence inappropriate. Further, in connection with the nature of the offense, Robinson argues that he was not as culpable as Hamler, and thus for him to have received the same sentence as Hamler was inappropriate.

[34] Turning to Robinson's criminal history, we observe that he has a long history of encounters with law enforcement, beginning in 2007 when he was still a juvenile. While a juvenile, Robinson was adjudicated a delinquent for acts that would have constituted the D-felony-level offense of Residential Entry if committed by an adult, and he violated probation associated with that delinquency finding. Robinson's encounters with law enforcement continued as an adult. In 2011, he was convicted of Possession of Marijuana, as a Class A misdemeanor. During 2012 in cases unrelated to the instant matter, Robinson was charged with Possession of Cocaine, Carrying a Handgun without a License on two separate occasions, Possession of Paraphernalia, Auto Theft, and Criminal Gang Activity. All of those charges remained pending at the time of trial and sentencing in this matter.

[35] As to Robinson's young age, we note that he was less than one month shy of twenty years old at the time of the instant offenses, and was twenty-one years

old when he was sentenced. He was employed and provided financial assistance to his child and grandmother.

[36] Finally, we turn to Robinson's contention that because he was less culpable and of better character than his co-defendant, Hamler, it was inappropriate that he receive the same sentence. While we recognize that Robinson was not actively involved in the beating of Keys and Finney, it was Robinson who opened the door for Keys and Finney to enter the recording studio. Robinson was one of only three individuals who was present at the recording studio the entire time; Hamler arrived later. Robinson was one of the four men who left the studio room to don gloves in order to "finish … off" Keys and Finney. (Tr. at 159.)

[37] Robinson concedes he was holding a rifle, but notes that Keys and Finney were shot by a pistol, perhaps implying that the evidence supports an inference that Robinson did not shoot either man. Finney's trial testimony, however, indicates that an individual with dreadlocks and dark clothing fired the shots that injured him and killed Keys. Finney testified that several individuals had dreadlocks and dark-colored clothing, including Robinson, and further testified that he could not identify specifically who fired the gun. We thus do not think that Robinson was less complicit than Hamler in a case where both men participated in a plot to lure Keys for the purposes of beating, robbing, and ultimately murdering him.

[38] Taken together, the nature of Robinson's offenses and his character do not persuade us that his sentence is inappropriate.

Affirmed.

Robb, J., and Brown, J., concur.