## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 29 2016, 10:16 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
|---|---|
| Matthew J. McGovern<br>Anderson, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana |
| | Justin F. Roebel<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William M. Hardison,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | February 29, 2016<br><br>Court of Appeals Case No.<br>22A01-1504-CR-273<br><br>Appeal from the Floyd Superior Court<br><br>The Honorable Susan Orth, Judge<br><br>Trial Court Cause No.<br>22D01-1303-FB-590 |

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, William Hardison[1] was convicted of one count of child molesting as a Class A felony and one count of child molesting as a Class C felony. He received an aggregate sentence of forty-five years executed in the Indiana Department of Correction. Hardison appeals his convictions and sentence, raising four issues for our review, which we consolidate and restate as 1) whether the trial court committed fundamental error in admitting certain evidence; and 2) whether Hardison's sentence is inappropriate in light of the nature of the offenses and his character. Concluding the trial court did not commit fundamental error in the admission of evidence and Hardison's sentence is not inappropriate in light of the nature of the offenses and his character, we affirm.

# Facts and Procedural History

[2] Born in 1999, J.C. grew up with her mother, D.C;[2] J.C.'s father abandoned the family when J.C. was two years old. Shortly thereafter, D.C befriended her neighbor, Hardison. When J.C. turned five years old, Hardison offered to babysit J.C. Needing a break, D.C agreed. Hardison began spending more alone time with J.C., including taking J.C. to the park and playing video games

---

[1] Hardison often went by the nickname "Billy."

[2] To enhance the child victim's privacy, we abbreviate her mother's name as well.

in his apartment. Recognizing J.C. did not have a fatherly figure in her life, Hardison began to act as one, and J.C. would sometimes call Hardison "dad." At some point, Hardison moved to a new apartment, but continued to spend alone time with J.C. at his apartment.

[3] In early February 2013, thirteen-year-old J.C. visited Hardison's apartment. According to J.C.,

> [A]round February 4th or 5th . . . he had asked if I would put in a movie and he had on his TV stand, he had, uh, there was, uh, the TV was here and the Playstation always stayed right underneath of it and it had drawers and he had the movies in there and I took the movies out and laid them across the floor and there was one in particular that I asked about, because it had naked women on the front of it, and I asked what it was, and he said it's just a porno, and I asked what it was and he told me to stick it in. Well, I did and I turn, I eventually took it out and put in an actual movie, and uh, a little bit later after the mo- the, we had watched a scary movie and after that movie was finished, uh the dog was, uh, jumping on the couch, so I started playing with him and, uh, I started running around the house with him and, uh, I had walked into Billy's bedroom and I sat on the bed to play with the dog and Billy sat up on the bed with me and he asked if he could touch my breast and I said, I said no, and then he asked if he could have sex with me and I said no. And then he just stopped asking and then Spike, [the dog], acted like he wanted to go to the restroom, so I let him out, because in Billy's bedroom the balcony was, uh, hooked to his bedroom, and I let Spike out and I sat on the bed and he asked if he could touch my breast again and I said no and he lifted my shirt and he touched my breast and then he asked if I would give him oral sex, and I asked him if he would quit asking if I did and he said yes, so I did.

Transcript at 288-89. Hardison ejaculated into J.C.'s mouth. J.C. "[s]pit it out in the sink and rinsed [her] mouth out." *Id.* J.C. did not tell her mother because "often [Hardison] would tell me not to tell her that things were happening because it was normal" for "[a] father and daughter." *Id.* at 292.

[4] On February 15, Hardison invited J.C. over to his apartment, stating he had a gift for her. When J.C. arrived, Hardison gave her a "dog key chain thing and a Valentine heart, little one with chocolates in it." *Id.* at 293. During the visit Hardison again requested J.C. perform oral sex on him. J.C. refused, but Hardison grabbed J.C.'s hand and forced J.C. to stroke his penis. J.C. attempted to stop when Hardison removed his hand from J.C.'s hand, but then Hardison put his hand back and told J.C. to keep going. Hardison ejaculated on J.C.'s hand. After Hardison returned J.C. to her mother's residence, J.C. sat in her room and cried; again, she did not tell her mother. At some point unclear from the record, J.C. disclosed Hardison's acts of molestation to her neighbor, Jasmine Ross. Ross told D.C., and D.C. called the police.

[5] The Indiana Department of Child Services ("DCS") assigned Margaret Kochert to J.C's case, and Kochert scheduled a forensic interview with Rebecca Sanders, a child forensic interviewer with the Family and Children's Place. At the forensic interview, J.C. disclosed Hardison's acts of molestation. On February 27, Detective Kelly Brown with the New Albany Police Department interviewed Hardison about J.C.'s allegations, and Hardison denied molesting J.C. and denied owning pornographic movies. Hardison later submitted to a stipulated polygraph examination. During the examination, the examiner

asked Hardison whether he had oral sex with J.C. and whether J.C. performed oral sex on him. Hardison denied both allegations, but his responses indicated deception. When questioned about his deception by Detective Brown, Hardison continued to deny any acts of molestation and stated, "I hope that girl burns in hell." *Id.* at 118. Despite previously stating he did not own pornographic material, Hardison admitted J.C. turned on a video game console and a pornographic movie started playing. Hardison also stated he thought J.C. had a crush on him and there was one incident where she sat on his lap and gave him a kiss.

[6] On March 19, the State charged Hardison with two counts of child molesting as Class B felonies. The State later amended Count I to a Class A felony and Count II to a Class C felony. At trial, the State called numerous witnesses, including J.C.; Hardison testified J.C.'s allegations were false. The jury found Hardison guilty of both counts. The trial court entered a judgment of conviction and sentenced Hardison to forty-five years for the Class A felony conviction and eight years for the Class C felony conviction, to be served concurrently. This appeal ensued. Additional facts will be added as necessary.

# Discussion and Decision

## I.  Admission of Evidence

### A.  Standard of Review

Hardison contends the trial court committed fundamental error in admitting repetitious testimony, vouching testimony, and testimony of Hardison's prior uncharged acts of molestation.  On appeal, we afford the trial court wide discretion in ruling on the admissibility of evidence.  *Beasley v. State*, No. 49S02-1601-CR-20, 2016 WL 166541, at *2 (Ind. Jan. 14, 2016).  In such circumstances, our review is limited to determining whether the trial court abused that discretion.  *Id.*  However, because Hardison did not contemporaneously object to the admission of the evidence at trial, a fact he concedes, the claims of error are waived.  *See Jackson v. State*, 735 N.E.2d 1146, 1152 (Ind. 2000).  Consequently, we will only reverse the trial court if the trial court committed fundamental error in the admission of evidence.  *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010).  The fundamental error exception is extremely narrow.  *Id.*  "Fundamental error is a substantial, blatant violation of due process that must be so prejudicial to the rights of a defendant as to make a fair trial impossible."  *Rosales v. State*, 23 N.E.3d 8, 11 (Ind. 2015) (internal quotation marks and citation omitted).

### B.  Challenged Testimony

Hardison contends the trial court committed fundamental error in admitting the testimony of five witnesses, including J.C.  First, Hardison cites to Detective

Brown's testimony about the lack of DNA evidence. Specifically, Detective Brown stated there is likely no DNA evidence when there is an allegation of oral sex and fondling made ninety-six hours after the alleged acts of molestation. In addition, Detective Brown testified at length regarding the process of investigating claims of child molestation. As a part of this process, Detective Brown explained once an allegation of child abuse is made, he schedules an interview for the child at the Child Advocate Center to see if the child discloses abuse during the interview.

> [State:] And if they disclose you're looking for signs they fabricated, is that correct?
> [Detective Brown:] Uh, obviously, uh, through that investigation, through that testimony, yes, we're looking for any signs or any type of motivation for any of the story to be fabricated.
> [State:] And if you don't see those signs and they disclose, then what do you do?
> [Detective Brown:] A true investigation will then ensue.

Tr. at 86-87. Thereafter, the State asked what steps Detective Brown took to corroborate J.C.'s disclosure:

> [Detective Brown:] Uh, like I said, there was certain [sic] individuals that were mentioned within, uh, the interview, so I began reaching out to them, making phone calls and stuff. And at times, uh, during any investigation with the police, a lot of times it's very difficult. Uh, we make phone calls, we don't get returned phone calls, we knock on doors, we might not get an answer and we leave a business card, but a lot times [sic] we don't get a call back, that there were a chance to make, get a hold of certain individuals in this case.

> [State:]  And in your opinion, was there, at this point, you were able to corroborate enough to move on into the investigation?
> [Detective Brown:]  Yes, Ma'am.
> [State:]  And how did you move forward in the investigation?

*Id.* at 91.  Hardison did not object, and Detective Brown continued to testify about the steps he took to move forward in the investigation.

[9]  On cross-examination, Hardison's counsel also stated the allegations on at least one occasion, observing, "But that's a long way from fondling her and having him be masturbated and oral sex and all that stuff."  *Id.* at 146-47.  Moreover, Hardison elicited testimony from Detective Brown about how he corroborated J.C.'s allegations, and Detective Brown testified that he discovered the acts of molestation had been occurring since J.C. was five or six years old.  Hardison did not move to strike but instead, immediately questioned Detective Brown about why the State did not charge Hardison with those acts of molestation.  Detective Brown stated J.C. struggled to recall specific dates because the acts of molestation had occurred for many years.  Again, Hardison did not move to strike and continued to ask questions about the exact dates Hardison molested J.C.

[10]  On re-direct, Detective Brown stated that the acts of molestation began when J.C. was five or six years old.  Hardison objected, arguing the line of questioning lacked relevancy.  The State argued the defense previously opened the door to the line of questioning in its cross-examination of Detective Brown,

and the trial court agreed, overruling the objection. Thereafter, Detective Brown testified:

> [State:] Tell me, tell me what starts at five (5) or six (6). Let's go through it.
> [Detective Brown:] Um, [J.C.], during the initial police report, through the Child Advocate Center interview, had uh, had made statements that Mr. Hardison had been, uh, molesting her since that-that age, had been doing, uh, had been giving Mr. Hardison oral sex and had been masturbating him for, uh, multiple, multiple times.
> [State:] What started off first?
> [Detective Brown:] I believe it was the, uh, the masturbating by hand.

*Id.* at 157-58.

[11]   Second, Hardison cites to Kochert's testimony. At trial, Kochert testified that she substantiated J.C.'s allegation. Kochert stated that when she substantiates an allegation of molestation, that means she believes that it did occur, but clarified:

> [State:] So I do want to be clear. When you say substantiate, you don't mean that they're a hundred percent (100%) guilty, do you, you just mean there's a factual foundation on which to move forward.
> [Kochert:] Correct.
> [State:] So at that point there's no real way to determine whether these things are actually true, it's just, uh, a way then you can proceed with the investigation?
> [Kochert:] Correct.
> [State:] So in this case, did you substantiate or not?
> [Kochert:] Yes, we substantiated.

*Id.* at 194. At the completion of Kochert's testimony, the trial court was concerned Kochert may have vouched for J.C.'s credibility and offered to provide the jury with a limiting instruction. Hardison refused the offer, stating, "It'd just be, it call, it calls attention to that fact. I think [the State] handled her great. I have no objections to it." *Id.* at 306.

[12]  Third, Hardison cites to Sanders's testimony. Sanders testified at trial about her forensic interview with J.C., and Sanders stated she found J.C.'s statements describing the acts of molestation to be consistent. Fourth, Hardison cites to Ross's testimony that J.C. had disclosed Hardison's acts of molestation to her. Finally, Hardison cites to J.C.'s testimony.

> [State:] Now, you used the term oral sex. Is that how he said it?
> [J.C.] No.
> [State:] What did he say?
> [J.C.] He asked if I would suck his dick.
> [State:] How in the world would you know how to do that?
> [J.C.] He had me do it since I was little.

*Id.* at 289. Hardison did not object.

[13]  Hardison contends the trial court committed fundamental error in admitting the above testimony because, when taken together, the testimony amounted to a drumbeat repetition of J.C.'s allegations, impermissible vouching testimony, and testimony of Hardison's prior uncharged acts of molestation.

### 1. Repetitious Testimony

[14] Hardison argues the trial court committed fundamental error when it permitted several of the State's witnesses to recount J.C.'s allegations before J.C. took the stand. Specifically, Hardison cites to *Modesitt v. State*, 578 N.E.2d 649 (Ind. 1991), and argues the State—through the testimony of Detective Brown, Ross, Kochert, and Sanders—created a prejudicial drumbeat repetition of the allegations against him. The State argues the witnesses only briefly acknowledged the nature of the allegations and did not present lengthy and repetitious hearsay evidence of J.C.'s allegations. We agree with the State.

[15] In *Modesitt*, the State charged Modesitt with three counts of child molestation and one count of criminal deviate sexual conduct. At trial, the victim's mother, a welfare caseworker, and a psychologist all testified before the victim. The trial court allowed, over objection, each witness to testify as to what the victim had told each of them concerning the acts of molestation. For example, the mother testified to several "instances of molestation involving breasts, vagina and penis that occurred . . . ." *Id.* at 650. The child welfare caseworker testified as to what the victim had disclosed in the interview, which overlapped the specific details the mother had testified to. In addition, the psychologist also "testified in a videotaped deposition as to what the victim had related to her concerning these same, and additional, instances of sexual molestation." *Id.* The Court noted that "by putting into evidence the victim's out-of-court charges against Modesitt by three separate and repetitive witnesses *prior to* calling the victim herself, the prosecutor effectively precluded Modesitt from effective cross

examination of the[] charges." *Id.* at 651 (emphasis in original). Such testimony essentially "vouchsafed" the victim's veracity. *Id.*

[16] At the outset, we note the four witnesses cited by Hardison all testified before J.C. testified. Unlike the witnesses in *Modesitt*, however, Ross's, Kochert's, and Sanders's testimony merely provided, in some general fashion, that J.C. disclosed sexual abuse; the testimony was brief and no witness elaborated upon the allegations with any specificity. *See Modesitt*, 578 N.E.2d at 651. As to Detective Brown's testimony, at no point did he detail J.C.'s allegations. Detective Brown merely acknowledged there would likely be no DNA evidence when there is an allegation of oral sex and fondling made ninety-six hours after the alleged acts of molestation; he also restated the allegations on re-direct. In addition, in a day and age where courtroom television dramas exaggerate the use and capability of scientific evidence, jurors likely expect there to be DNA evidence in criminal cases, *see generally* Hon. Donald E. Shelton, *Juror Expectations for Scientific Evidence in Criminal Cases: Perceptions and Reality about the "CSI Effect" Myth*, 27 T.M. Cooley L. Rev. 1 (2010), and we cannot fault the State for eliciting testimony showing why there was no DNA evidence in the present case. Moreover, when comparing the above witnesses' testimony to J.C.'s testimony, J.C.'s testimony was much more detailed and explicit.

[17] Finally, we note Sanders's, Kochert's, Ross's, and Detective Brown's testimony did not restate the allegations with any more specificity than Hardison's counsel when he observed, "But that's a long way from fondling her and having him be masturbated and oral sex and all that stuff." Tr. at 156. Ultimately, our review

of the record indicates no drumbeat repetition of J.C.'s allegations; J.C. was the *only* witness to testify as to her version of the events, and the remaining witnesses merely restated the general allegations. *See Stone v. State*, 536 N.E.2d 534, 540-41 (Ind. Ct. App. 1989) (finding "rampant repetition" of the victim's testimony because between the five witnesses and the victim, the victim's version of the alleged molestation was presented to the jury a total of seven times; as a result, "the line between [the victim's] credibility became increasingly unimpeachable as each adult added his or her personal eloquence, maturity, emotion, and professionalism to [the victim's] out-of-court statements"), *trans. denied*. Therefore, we conclude the trial court did not commit fundamental error in allowing the testimony.

## 2. Vouching Testimony

[18] Although very similar to the argument above, Hardison next contends the trial court committed fundamental error when it permitted Detective Brown, Kochert,[3] and Sanders to vouch for J.C.'s credibility. Under Indiana Evidence Rule 704(b), "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." This rule prohibits both direct and indirect vouching testimony. *Hoglund v. State*, 962 N.E.2d 1230,

---

[3] In his brief, Hardison claims "Jasmine Ross, the DCS employee," vouched for J.C., but his citations are to Kochert's testimony. Br. of Appellant at 14. Considering Ross was J.C.'s neighbor, and Kochert was the DCS employee, we examine Kochert's testimony to see if she impermissibly vouched for J.C.'s credibility. Nevertheless, our review of Ross's testimony does not indicate she impermissibly vouched for J.C.

1235-36 (Ind. 2012). "[T]estimony concerning whether an alleged child victim is not prone to exaggerate or fantasize about sexual matters is an indirect but nonetheless functional equivalent of saying the child is 'telling the truth.'" *Id*. at 1236 (quotation and citation omitted). Vouching testimony is considered an "invasion of the province of the jurors in determining what weight they should place upon a witness's testimony." *Bean v. State*, 15 N.E.3d 12, 18 (Ind. Ct. App. 2014) (citation omitted), *trans. denied*.

[19] In *Heinzman v. State*, 970 N.E.2d 214 (Ind. Ct. App. 2012), *vacated in part*, *and summarily aff'd in part*, 979 N.E.2d 143 (Ind. 2012), we encountered a similar claim of impermissible vouching testimony. There, a DCS investigator testified:

> Q: Would it be a proper statement to say that when you substantiate a case you find a reason to believe the allegations may have some factual foundation?
> A: Yes, that would be correct.
> Q: So there's no way for you to tell or to say whether or not at that point in time that they are absolutely beyond doubt true, but they have a foundation upon which to proceed with further investigation?
> A: That's correct.
> Q: Okay. And if you had unsubstantiated it, then there would have been no basis for further investigation as far as your department was concerned; is that correct?
> A: That's correct.

*Id.* at 221-22. We concluded the testimony neither directly vouched for the truthfulness of the victim nor constituted an opinion regarding the truth of the allegations because the investigator "testified that there was a factual basis to

support further investigation. She did not testify to an opinion concerning guilt or innocence, the truth or falsity of allegations, or whether a witness had testified truthfully." *Id.* at 223.

[20] Here, Hardison cites to the parts of Sanders's testimony where she stated she found J.C.'s statements in the forensic interview to be consistent, parts of Detective Brown's testimony where he stated he corroborated J.C.'s allegations, and parts of Kochert's testimony where she stated she substantiated J.C.'s claims. We are not persuaded any of this testimony carried any kind of vouching force.

[21] As to Detective Brown's testimony, he testified generally about how he investigates claims of child molestation and stated if he finds no signs of fabrication following a child's disclosure, then a true investigation will begin. At no point did he testify whether he believed J.C. showed signs of fabrication or whether he believed J.C.'s allegations to be true; nor did he opine as to whether any other witness had testified truthfully. *See id.* Rather, he stated based upon J.C.'s disclosure, and his subsequent interviews with those mentioned in J.C.'s interview, the case required further investigation.

[22] As to Sanders's testimony, she testified her role in the investigation was "just to get as much detail as a possibly [sic] can without ever leading them to any details or suggesting any details to them." Tr. at 211. Sanders's goal was not to elicit the truth, but rather to provide an atmosphere where J.C. would feel comfortable discussing Hardison's acts of molestation.

[23]     As to Kochert's testimony, she testified that her goal in an investigation is to either substantiate or unsubstantiate a child's disclosure of abuse. If she does substantiate a claim, she testified she believes the act of molestation occurred, but that it did not mean the alleged individual was guilty of child molestation. Similar to *Heinzman*, Kochert stated a substantiation meant there was enough of a factual foundation to move forward in the investigation. In our view, these witnesses neither directly vouched for J.C.'s truthfulness nor offered an opinion regarding the truth of J.C.'s disclosure. *See Heinzman*, 970 N.E.2d at 223.

[24]     In addition, we note Hardison invited any error in the admission of Kochert's testimony. After it became concerned Kochert may have impermissibly vouched for J.C.'s credibility, the trial court offered to provide the jury with a limiting instruction. Hardison declined the offer. When a limiting instruction provides that certain evidence may be considered for only a particular purpose, the law will presume that the jury will follow the trial court's admonitions. *Ware v. State*, 816 N.E.2d 1167, 1176 (Ind. Ct. App. 2004). Here, not only did Hardison choose not to object to the alleged vouching testimony, but Hardison also declined the trial court's offer to provide a limiting instruction to the jury; Hardison made a strategic decision, claiming he did not want to call more attention to the fact Kochert substantiated J.C.'s allegations. "A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error." *Gamble v. State*, 831 N.E.2d 178, 184 (Ind. Ct. App. 2005) (citation omitted), *trans. denied*.

We conclude the trial court did not err in admitting Sanders's, Kochert's, and Detective Brown's testimony. Accordingly, the trial court did not commit fundamental error.

### 3. Prior Alleged Misconduct

Hardison's final contention is the trial court committed fundamental error in allowing the State to elicit testimony about Hardison's prior uncharged acts of molestation in violation of Indiana Evidence Rule 404(b).[4] "Evidence Rule 404(b) specifically bars the admission of evidence of other crimes, wrongs, or bad acts allegedly committed by the defendant to prove the defendant's character, and forbids the use of this kind of evidence to show that the defendant acted in a manner consistent with that character." *Wilhelmus v. State*, 824 N.E.2d 405, 414 (Ind. Ct. App. 2005).

On cross-examination, Hardison elicited testimony from Detective Brown about how Detective Brown began to corroborate J.C.'s allegations against Hardison. In doing so, Detective Brown stated that Hardison's acts of molestation had been occurring since J.C. was five or six years old. Hardison's counsel did not move to strike but instead, immediately questioned Detective Brown about the alleged prior uncharged acts of molestation. Detective Brown testified the State did not charge Hardison with the prior alleged acts of

---

[4] Hardison also argues evidence of his alleged prior molestations of J.C. was inadmissible under Rules 401, 402, and 403. Because we conclude any error in admitting evidence of prior uncharged acts was not fundamental, we need not address the merits of Hardison's additional arguments pertaining to the admission of prior uncharged acts.

molestation because J.C. struggled to recall specific dates. Again, Hardison did not move to strike and continued to ask questions about the exact dates Hardison molested J.C. On re-direct, the State asked Detective Brown to clarify when Hardison "really" began molesting J.C., and Detective Brown responded, "Uh, when [J.C] was approximately six (6) years old . . . ." Tr. at 156. Hardison objected, arguing the question was "not relevant to the charges filed" in the case. *Id.* at 157. The State argued Hardison had previously opened the door to such testimony, and the trial court agreed.

[28] Following the conclusion of Detective Brown's testimony, the trial court discussed the issues regarding the admission of Rule 404(b) evidence; the trial court was concerned with the admission of testimony about Hardison's prior uncharged acts of molestation. During the sidebar, the State again argued the defense opened the door to such testimony, but the trial court recommended both parties "move on." *Id.* at 168. However, the State indicated it intended to elicit testimony from J.C. about Hardison's prior uncharged acts of molestation because the door had been opened to such testimony. Hardison did not offer a response to the State's request, stating, "I'll just let it ride and object at the right time." *Id.* at 169. The trial court took the matter under advisement.

[29] Before J.C. testified for the State, the trial court again brought counsel together to discuss the admission of Rule 404(b) evidence. The trial court stated it agreed with the State that a door had been opened, but concluded the jury was no longer left with a wrong impression about why Hardison was not charged with prior acts of molestation. Based on this reasoning, the trial court told both

parties to "stay away from continued questioning regarding" Hardison's prior uncharged acts of molestation. *Id.* Thereafter, the State called J.C. to testify, and after describing how Hardison made her perform oral sex, J.C. stated, "He had me do it since I was little." *Id.* at 289. Hardison did not object.

[30] On appeal, Hardison concedes he did not object at trial, and therefore argues the admission of prior uncharged acts of molestation constituted fundamental error. Assuming the trial court did err,[5] we conclude the trial court did not commit fundamental error. It is well-settled "the erroneous admission of . . . uncharged bad act evidence to prove guilt does not always require reversal." *Oldham v. State*, 779 N.E.2d 1162, 1173 (Ind. Ct. App. 2002), *trans. denied*. In *Manuel v. State*, 793 N.E.2d 1215 (Ind. Ct. App. 2003), *trans. denied*, Manuel was convicted of three counts of child molesting. On appeal, Manuel argued the admission of the child victim's testimony regarding prior uncharged molestations constituted fundamental error. We concluded,

> D.M.'s testimony regarding the uncharged molestations was brief and lacked detail. In contrast, her testimony regarding the charged molestations was lengthy, detailed, and graphic. Evidence supporting Manuel's convictions consisted of D.M.'s testimony, physical evidence of seminal material in her mouth, and testimony that he babysat D.M. on the night of the charged molestations. We conclude that the admission of D.M.'s testimony regarding the prior uncharged molestations had a

---

[5] Both parties dispute whether the defense previously opened the door, and assuming it did, whether the door had been closed through the testimony of Detective Brown; the record indicates the trial court heavily struggled with this issue. Because we conclude any error was harmless, we need not address whether the trial court did, in fact, err.

minimal impact on the jury, did not deny Manuel fundamental due process, and therefore was not fundamental error.

*Id.* at 1219.

[31] Similar to *Manuel*, the testimony here regarding the uncharged acts of molestation was brief and lacked detail; in contrast, J.C.'s testimony regarding the charged acts of molestation was very explicit and detailed. In addition, evidence supporting Hardison's convictions consisted of J.C.'s testimony, Hardison's stipulated polygraph results, and testimony showing J.C. and Hardison often spent time alone together in Hardison's apartment. Finally, we note Hardison testified in his own defense and denied molesting J.C. Such testimony provided the jury with two conflicting stories and the choice of whom to believe; the jury believed J.C. Therefore, we conclude the admission of evidence regarding the prior uncharged acts of molestation had, if any, a minimal impact on the jury and did not deny Hardison fundamental due process; accordingly, the trial court did not commit fundamental error. *See Manuel*, 793 N.E.2d at 1219.

## II. Inappropriate Sentence

### A. Standard of Review

[32] Hardison also contends his sentence is inappropriate in light of the nature of the offenses and his character. A reviewing court possesses the authority to revise a defendant's sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense

and the character of the offender." Ind. Appellate Rule 7(B). The burden is on the defendant to persuade the reviewing court the sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006). "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008). It is not for the reviewing court "to achieve a perceived 'correct' result in each case," but "[t]he principal role of appellate review should be to attempt to leaven the outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate turns on "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Id.* at 1224.

## B. Hardison's Sentence

[33] As to the nature of the offenses, the advisory sentence is the starting point the legislature selected as an appropriate sentence for the crime committed. *Anglemyer v. State,* 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g,* 875 N.E.2d 218 (Ind. 2007). Here, Hardison was convicted of a Class A felony and a Class C felony. Pursuant to Indiana Code section 35-50-2-4(a), an individual who commits a Class A felony "shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years." Pursuant to Indiana Code section 35-50-2-6(a), an individual who commits a Class C felony "shall be imprisoned for a fixed term of between two (2) and eight (8) years, with the advisory sentence being four (4) years." Hardison received a forty-five-year sentence on Count I and an eight-year

sentence on Count II, to be served concurrently for an aggregate sentence of forty-five years executed in the Indiana Department of Correction.

[34] We note Hardison was in a position of trust and authority in relation to J.C. Initially, Hardison befriended D.C. and earned her trust. After recognizing D.C. needed assistance with J.C.'s care, Hardison capitalized on the opportunity to spend more alone time with J.C. As a result, Hardison earned J.C.'s trust and became the fatherly figure J.C. lacked in her life. In addition, Hardison exploited J.C.'s vulnerability by persuading J.C. that sexual conduct was normal in a father-daughter relationship. J.C. testified Hardison's actions have left her angry, upset, confused, bothered, and contemplating suicide on multiple occasions. *See* Tr. at 500-02. We cannot ignore such conduct.

[35] As to his character, we note there is nothing in the record to indicate Hardison's character is especially egregious beyond the conduct for which he was convicted. We do note, however, that after being confronted with his polygraph results, Hardison stated, "I hope that girl burns in hell." *Id.* at 118. In any event, our goal on appeal is to leaven the outliers, not achieve the "correct" result. *See Cardwell*, 895 N.E.2d at 1222. Therefore, we are not persuaded Hardison's sentence is inappropriate.

# Conclusion

[36] Concluding the trial court did not commit fundamental error and Hardison's sentence is not inappropriate in light of the nature of the offenses and his character, we affirm.

[37] Affirmed.

Barnes, J., and Altice, J., concur.