## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 10 2017, 7:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeremy K. Nix
Huntington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Ricky L. Sands, <br> *Appellant-Defendant*, <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff*. | May 10, 2017 <br><br> Court of Appeals Case No. 90A02-1610-CR-2309 <br><br> Appeal from the Wells Circuit Court <br><br> The Honorable Kenton W. Kiracofe, Judge <br><br> Trial Court Cause No. 90C01-1606-FA-2 |

**Brown, Judge.**

[1] Ricky L. Sands appeals his sentence for two counts of child molesting as class A felonies, two counts of child molesting as class C felonies, dissemination of matter harmful to minors as a class D felony, and two counts of contributing to the delinquency of a minor as class A misdemeanors. Sands raises two issues which we consolidate and restate as whether his sentence is inappropriate in light of the nature of his offenses and character. We affirm.

## *Facts and Procedural History*

[2] Between July 1, 2011, and July 3, 2012, when Sands's stepson P.P. was either twelve or thirteen years of age, Sands placed his penis on P.P.'s mouth, placed his mouth on P.P.'s penis, fondled or touched P.P.'s penis with the intent to satisfy the sexual desires of P.P. or himself, submitted to P.P. touching his penis with the intent to satisfy the sexual desires of P.P. or himself, and showed P.P. pornographic movies. On or about June 22, 2016, Sands permitted his stepdaughter I.P. and another minor to consume alcohol.

[3] On June 28, 2016, the State charged Sands with: Count I, child molesting for submitting to deviate sexual conduct by P.P. as a class A felony; Count II, child molesting for performing deviate sexual conduct with P.P. as class A felony; Count III, child molesting for performing fondling and/or touching with P.P. as a class C felony; Count IV, child molesting for submitting to fondling and/or touching with P.P. as a class C felony; Count V, dissemination of matter harmful to minors as a class D felony; Count VI, contributing to the delinquency of a minor for aiding I.P. in committing minor consumption of alcohol as a class A misdemeanor; and Count VII, contributing to the

delinquency of a minor for aiding H.L. in committing minor consumption of alcohol as a class A misdemeanor. The State also filed a notice of intent to seek habitual offender status.

[4] On June 30, 2016, the trial court held an initial hearing at which, after informing Sands of the charges and sentencing ranges, it ordered that Sands was to have no contact with P.P., I.P., J.S., R.S., and H.W.[1] Sands and the State subsequently entered into a written plea agreement pursuant to which Sands would enter a plea of guilty to Counts I through VII, all terms of the sentence would be left to the court's discretion, the sentences under Counts I through VII would be concurrent with each other, and the habitual offender enhancement would be dismissed. On August 24, 2016, the court held a guilty plea hearing at which Sands pled guilty consistent with the terms of the plea agreement.

[5] On September 28, 2016, the court held a sentencing hearing at which the court admitted into evidence without objection an officer incident report, which the prosecutor stated was part of the probable cause affidavit, and a written statement of Sands made during the investigation. The officer incident report states that P.P. indicated that Sands had been physically and sexually abusive and that there had been touching, oral sex, and anal sex. The report states that P.P. disclosed that Sands had him wrap his arms around a tree, duct-taped his

---

[1] While the charging information and factual basis at the guilty plea hearing refer to "H.L.," the no contact orders identify "H.W." J.S. and R.S. are Sands's biological children.

wrists together, and spanked him with a 2x4, and P.P. also recalled being spanked with a belt numerous times. The report indicates that P.P.'s first recollection of activity of a sexual nature was when he was approximately ten to twelve years old, that Sands showed him pornography, Sands played with P.P.'s penis and touched his penis with his hand skin-to-skin, and that this occurred more than one time. It also states that, when asked to be more clear about the meaning of oral sex, P.P. stated "mouth to penis," that the oral sex began as Sands performing oral sex on P.P., Sands then "wanted something back so [P.P.] did it to him," and that this occurred at two residences. State's Exhibit 1 at 3. P.P. "said that the oral sex performed on him usually ended because he would 'orgasm' in Sands['s] mouth and that anal sex occurred one time." *Id.* at 4.

[6] The incident report further states that P.P. said that Sands would often provide him with alcohol and marijuana, that P.P. "says that Sands will often have various men over and spend time with them in the garage," that Sands "often asked [P.P.] to go to 'have fun' with him but [P.P] refuses," and "that Sands has shown his video of these men giving Sands a blow job." *Id.* P.P. stated that Sands had shown him pornography on various computers, that P.P. stated that "he is afraid that Sands may have 'moved onto [I.P.]' his sister," Sands had a watch with a camera in it which he used to record men performing oral sex on him, one time Sands left the watch on a bathroom counter and filmed P.P.'s sister, and Sands attempted to show P.P. this video. *Id.* The report also indicates that P.P. stated "Sands has threatened him if he told anyone. Stating

he would knock his head off and hit him so hard that he won't wake up until after Sands in [sic] out of prison." *Id.*

[7]    As to I.P., the report states that I.P. "also discussed how Sands would place his hands on her breasts," "this was always outside her clothing," "he would place his hands on her breasts and move them around but not physically 'grab' her breasts," and this has happened more than one time. *Id* at 6. The report also indicates that Sands admitted "to using a watch with a video camera in it to record his stepdaughter . . . getting into and out of the shower." *Id.* at 7. The incident report also indicates that H.W. stated that, when she and I.P. were having a sleepover, Sands "left and went and bought them wine" and "was aware that they were drinking and at one point was smoking marijuana with in [sic] front of them." *Id.*

[8]    The written statement of Sands admitted into evidence stated "I at times in the past have had sexual contact with my stepson," "[i]t happened a few times" at one residence "and a couple of times at" another residence, and "[w]e have touched each other and had oral sex." State's Exhibit 2. It also stated "I made a video of [I.P.] getting into the shower" and "[a]fter [P.P.] and I watched it, I erased it." *Id.*

[9]    Beth Webber indicated she had been appointed to be the victim representative, and read a letter from P.P. to Sands, stating:

> There is so much to say to you and so little amount of time.
> Things have happened between us. . . . I did not do this, tell on
> you, to get you into trouble or to get out of the house like I was

accused of. It was going to come out sooner or later. . . . It did not help that I was scared. I was afraid what was going to happen after I told you no. I was afraid that there was going to be another victim. I was scared it was going to be one of my siblings. In all honesty, I was scared it was going to happen to his sister, I won't say her name. I was afraid. I was scared of you. There was so much I wanted to say to you but I was scared to say to in fear of getting hurt. . . . You said what happened was a way to get closer but you didn't see that we were already close. Yes, we fought but we lived in the same house. . . . We both know what happened was wrong.

Transcript at 37. Webber testified "[i]t started with physical abuse from the time he can remember Mr. Sands coming into his life," "[t]his victim talked about being duct taped" and "about being hit and slammed, being threatened," "[h]e talked extensively about being physically abused, about his head being shoved into a wall to the point that it broke the drywall," "[s]o that is how this relationship started and Mr. Sands got power over this child," and "[t]hen it turned into a sexual relationship." *Id.* at 38. Webber further testified "[t]his child spoke with me about how Mr. Sands plied this child with alcohol and drugs as part of getting him to participate in these sex acts" and P.P. has had trouble at school, ran away from home frequently, sexually acted out with other children, and "still has tremendous anger issues to work out." *Id.* at 38-39.

[10]     Sands testified that he was very sorry for his actions and that "[b]ecause of my actions I leave behind a broken home, broken stepchildren, broken children, broken wife, a broken family" and "[i]t goes deeper than that because it affects a former family as well. I'm sorry to have hurt anyone." *Id.* at 41. He asked the court to "show any leniency that they can simply because of the age of my

children and because of my age" and that he be placed in a facility where he could receive counseling. *Id.*

[11] The trial court found the aggravating circumstances included that Sands was the victim's stepfather, threatened to harm the victim if he told anyone about the offense, had a history of criminal behavior, was attempting to groom another set of victims, provided drugs and alcohol to help facilitate the crimes, engaged in a course of physical abuse, secretly recorded I.P. in the bathroom, invited the child to participate in sex acts with other men, and robbed the child of his childhood. The court found the mitigating circumstances were that Sands was the family income provider, he accepted responsibility for his actions and pled guilty, and was himself a prior victim. It sentenced Sands to fifty years for each of his class A felony convictions, eight years for each of his class C felony convictions, three years for his class D felony conviction, and one year each for his class A misdemeanor convictions, and ordered that the sentences be served concurrently for an aggregate sentence of fifty years. The court also indicated that Sands is not a credit restricted felon and ordered him not to have contact with P.P., I.P., R.S., J.S., and H.W. during his executed sentence.

## *Discussion*

[12] The issue is whether Sands's aggregate sentence of fifty years is inappropriate in light of the nature of his offenses and character. Ind. Appellate Rule 7(B) provides that we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [we find] that the sentence is inappropriate in light of the nature of the offense and the character of the

offender." Under this rule, the burden is on the defendant to persuade the appellate court that his or her sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006). Sentencing is principally a discretionary function in which the trial court's judgment should receive considerable deference. *Hines v. State*, 30 N.E.3d 1216, 1225 (Ind. 2015) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008)). "[A]ppellate review should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." *Cardwell*, 895 N.E.2d at 1225. "[W]hether we regard a sentence as appropriate at the end of the day turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Hines*, 30 N.E.3d at 1225 (quoting *Cardwell*, 895 N.E.2d at 1224). Credit time status may be considered by an appellate court exercising its review and revise authority. *Sharp v. State*, 970 N.E.2d 647, 650 (Ind. 2012).

[13] Sands contends the nature of the offenses and his character do not support his maximum fifty-year sentence and asserts he has been P.P.'s stepfather since P.P. was six years old, "had a positive influence on P.P.'s life for a substantial period of time prior to the abuse occurring," and provided financially for the family. Appellant's Brief at 14. He also notes his last conviction occurred in 1991, eight years prior to P.P.'s birth.

[14] We observe that the trial court ordered that Sands's sentences be served concurrently consistent with the plea agreement and noted that Sands is not a

credit restricted felon.

[15] Our review of the nature of the offenses reveals that Sands placed his penis on his twelve- or thirteen-year old stepson P.P.'s mouth, placed his mouth on P.P.'s penis, fondled or touched P.P.'s penis, submitted to P.P. touching his penis, showed P.P. pornographic movies, and permitted his stepdaughter I.P. and another minor to consume alcohol. Sands's offenses against P.P. occurred numerous times and at defferent locations.

[16] Our review of the character of the offender reveals that Sands pled guilty and in exchange the State agreed to dismiss the habitual offender allegation and that the sentences would be served concurrently. The presentence investigation report ("PSI") states Sands was born in 1951 and he pled guilty to two counts of receiving stolen property, dealing in marijuana, and possession of marijuana as class D felonies in 1989; pled guilty to two counts of theft and to receiving stolen property as class D felonies in 1991; and was charged with battery in 1996, entered a pretrial diversion program, and the case was later dismissed. The PSI states that Sands reported he was molested by two different men when he was a teenager, that he has four children, two of whom are adults, his son J.S. is twelve years old, and his son R.S. is nine years old. Sands reported that J.S. and R.S. were removed from the home as a result of his arrest for the current offenses, and CHINS proceedings were initiated for P.P., I.P., J.S., and R.S. Sands reported he retired in 2008 when the company at which he worked closed, he was receiving $649 per month in social security benefits at the time of his arrest, and his wife did not work outside the home. The PSI further

indicates Sands reported he first experimented with marijuana at age twenty-five and last smoked in June 2016, described his use as occasional, and completed substance abuse treatment in 1991 as a term of his parole. Further, the trial court stated it believed there was some indication that Sands was attempting to groom another set of victims in the near future.

[17] After due consideration, and in light of Sands's position of trust, multiple offenses, and concurrent sentences, we conclude that he has not sustained his burden of establishing that his aggregate sentence of fifty years is inappropriate in light of the nature of his offenses and his character.

[18] To the extent Sands asserts there is not a nexus between his crime and the trial court's order that he not have contact with his biological children, J.S. and R.S., we note Ind. Code § 35-38-1-30 provides for a particular consequence upon the commission of a crime. "A sentencing court may require that, as a condition of a person's executed sentence, the person shall refrain from any direct or indirect contact with an individual." Ind. Code § 35-38-1-30. Although the statute employs the phrase "an individual" to describe the person to be protected, there must necessarily be some nexus between the no contact order and the crime for which the defendant is being sentenced. To interpret the statute otherwise would result in an absurdity, something which we will avoid. *See Howe v. State*, 25 N.E.3d 210, 214 (Ind. Ct. App. 2015) ("While the statutory provision uses the phrase 'an individual' to describe the person to be protected, there must be some nexus between the no contact order and the crime for which the defendant is being sentenced, as to interpret the statute

otherwise would result in an absurdity, something which we will avoid.")
(citation omitted). The record reveals that Sands pled guilty to four counts of
child molesting, one count of dissemination of matter harmful to minors, and
two counts of contributing to the delinquency of a minor. The PSI indicates
that J.S. and R.S., who were twelve and nine years old, respectively, were
removed from Sands's home as a result of Sands's arrest and CHINS
proceedings were initiated for P.P., I.P., J.S., and R.S. P.P.'s letter, read at
sentencing, indicated he was "afraid that there was going to be another victim"
and was "scared it was going to be one of [his] siblings." Transcript at 37. The
trial court expressly noted its belief that Sands was attempting to groom another
set of victims. Based upon the record, we cannot say there was no nexus
between the crimes for which Sands was sentenced and the order he have no
contact with J.S. and R.S. and We do not disturb the no contact orders.

### Conclusion

[19] For the foregoing reasons, we affirm Sands's sentence.

[20] Affirmed.

Vaidik, C.J., and Bradford, J., concur.