## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 15 2019, 10:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald R. Shuler
Goshen, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caroline G. Templeton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Cody N. Garman,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | March 15, 2019<br><br>Court of Appeals Case No.<br>18A-CR-1275<br><br>Appeal from the Elkhart Circuit Court<br><br>The Honorable Michael A. Christofeno, Judge<br><br>Trial Court Cause No.<br>20C01-1705-MR-004 |

**Tavitas, Judge.**

## Case Summary

[1] Cody Garman appeals his sentence for involuntary manslaughter, a Level 5 felony. We affirm in part, reverse in part, and remand.

## Issues

[2] Garman raises two issues, which we restate as follows:

> I. Whether the trial court erred in failing to award Garman good time credit.
>
> II. Whether Garman's sentence is inappropriate.

## Facts

[3] On May 25, 2017, Garman posted a Craigslist advertisement under the "casual encounters" section of the website seeking sexual acts in Elkhart County, where Garman lived. David Swartley responded to Garman's Craigslist advertisement that night between 1:00 a.m. and 1:40 a.m. After Garman and Swartley exchanged messages, they agreed to meet. Swartley arrived at Garman's house at approximately 3:00 a.m. Garman left the house and got in Swartley's vehicle in the passenger seat.

[4] Swartley drove his vehicle around the back of Garman's house because Garman lived with his family, and Garman did not want them to see him with Swartley. Garman and Swartley engaged in various sexual acts. Garman claimed Swartley also made several other comments and attempted to perform

other sexual acts on Garman, which Garman told Swartley he did not want to do.

[5] At some point during the interaction in the backseat, Garman testified that he felt Swartley drip liquid from a "vial" into Garman's nose. Tr. Vol. IV p. 112. Garman stated that he did not "pass all the way out," but that he "faded out." *Id.* When Garman "woke up," Swartley was on top of him, and Garman "freaked out," "kicked [Swartley] away," and struck Swartley in the face with his fist. *Id.* Garman then got in the front seat of Swartley's vehicle and drove away with Swartley still in the back seat. Garman found a small pathway in the woods and left Swartley's vehicle there. Garman heard Swartley call for help as Garman fled the scene on foot.

[6] Later that morning, at approximately 8:20 a.m., a person who lived in the area noticed the parked vehicle and called police. Corporal Andrew Ahlersmeyer with the Elkhart County Sheriff's Department responded to the call and found the vehicle in the woods in the 24000 block of Ne Ce Dah Drive in Elkhart. When Corporal Ahlersmeyer approached the vehicle in the woods, he noticed a shirtless male, later identified as Swartley, in the backseat of the vehicle, and positioned in an "unusual" way. Tr. Vol. II p. 83. At the time Corporal Ahlersmeyer approached the vehicle, Swartley appeared to be alive. Corporal Ahlersmeyer called an ambulance to the scene. Emergency personnel, who arrived at the scene, were not immediately able to find keys to the vehicle, and Garman later told detectives that he had thrown the keys to the vehicle in the wooded area.

[7] Once medics got Swartley into the ambulance, he "postured,"[1] in a way that was indicative of a head injury. Garman's beating of Swartley resulted in a subdural hematoma, a kick bruise to Swartley's shoulder, a laceration to the top of Swartley's head, bruises to both sides of Swartley's face, three lacerations to different areas of Swartley's mouth, a lacerated ear, broken cartilage, extensive bruising to Swartley's head, serious trauma, neck contusions, and critical brain trauma. Swartley's delayed treatment due to Garman secreting Swartley's car and abandoning Swartley exacerbated Swartley's injuries. Swartley's death was declared a homicide as a result of "multiple injuries" from blunt force trauma and abandonment after this beating.[2] Tr. Vol. III p. 144.

[8] Subsequently, Garman was charged with murder. The jury trial commenced on March 19, 2018. During the trial, Garman contacted his friend, Regina Uribe, and asked Uribe to contact jurors outside of the court proceedings and give the jury information regarding Swartley. Specifically, Garman wanted Uribe to tell a member of the jury that she knew someone whom Swartley had allegedly raped. There is no indication in the record that Swartley was ever convicted of rape. Additionally, Garman asked Uribe to encourage Garman's grandmother to make the same allegation. On the phone call, Garman advised Uribe that

---

[1] When a patient "postures," he or she "tense[s] up, and [his or her] arms will draw into the core of [his or her] body. It's called decorticate posturing, and what that indicates is that there is . . . an injury between the pathway from the brain to the spinal cord." Tr. Vol. II p. 136.

[2] Doctors believed Swartley had "intracranial bleeding," which is bleeding inside the skull, as well as "a hemorrhage to the brain stem, which is actually bleeding inside the brain stem itself." Tr. Vol. II pp. 190-91. Ultimately, doctors did not believe that Swartley was "amenable to any surgery[,]" and that, in fact, surgery would be "fruitless." *Id.* at 194.

the jury would likely send Garman home that day if Uribe was to communicate that message to the jury.

[9] The State published the audio recording of Garman's call from the Elkhart County Jail to Uribe during Garman's trial. Garman testified in his own defense. On cross-examination, when asked about the call, Garman indicated that he wanted the jury to "know the truth" about Swartley.[3] Tr. Vol. IV p. 186. No evidence, however, was ever located that Uribe or Garman's grandmother ever contacted a juror. The jury convicted Garman of involuntary manslaughter, a Level 5 felony, as a lesser included offense of murder.

[10] Garman was sentenced on April 19, 2018. The trial court found as mitigating factors: Garman's statements of remorse at his sentencing hearing, including statements expressed by Garman's attorney; Garman's youthful age of twenty-three; and Garman's low risk to reoffend by the IRAS score.

[11] The trial court found as aggravating factors: Garman's prior criminal history; Garman's previous probation violation for testing positive for cocaine; Garman's drug and alcohol use, which the trial court indicated showed "a disdain and a disregard for the law." Appellant's App. Vol. II p. 163. Also the trial court found that Garman's other sanctions did not result in rehabilitation

---

[3] Garman testified that, during the discovery process, he learned things about Swartley, and he wanted the jury to have a full picture of the victim. Specifically, it appears Garman wanted the jury to know about certain Craigslist advertisements Swartley had posted under "casual encounters," which Garman's attorney classified as "horrific requests." Tr. Vol. IV p. 120. These Craigslist advertisements were not admitted as evidence during the trial.

of Garman and that Garman "has not taken advantage of programming and alternative sanctions offered to him in the past[.]" *Id.* The trial court also considered as aggravating factors the victim's age of sixty-six; "[t]he harm, injury, loss or damages was significant and greater than the elements of the crime in that Swartley was "beaten to death and left to die[.]" *Id.* Garman was in a position to help Swartley, but left Swartley to die. Furthermore, Garman planned and recruited a friend to tamper with the jury, which Garman admitted. The trial court also considered Garman's disturbing statement in his pre-sentence investigation report that Garman was "not happy or sad about [the offense]. I'm kind of sad someone ended up dying [for my] actions." Appellant's App. Vol. II p. 190. The trial court noted Garman showed no remorse for his actions in making this statement. Finally, the trial court considered that Garman drove Swartley's car to a secluded area to hide his crime, making it virtually impossible for anyone to render assistance to Swartley.[4]

[12] The trial court awarded Garman credit for time served, but declined to grant Garman good time credit. The trial court sentenced Garman to six years by enhancing the three-year advisory sentence by three additional years based on the aggravators. Garman now appeals his sentence.

---

[4] Although not explicitly stated as an aggravating factor, Garman also conducted internet searches in an attempt to learn how to remove his DNA from certain objects. Garman also searched an obituary website for "Tradell Lesure," which was the name that appeared to be connected to Swartley, at 9:46 p.m. on May 25, 2017. Tr. Vol. IV p. 44. Swartley was not declared dead until after 10:00 p.m. on May 25, 2017.

Analysis

Garman appeals his sentence in two different respects. First, Garman argues that he was improperly deprived of good time credit. Second, Garman argues that his sentence was inappropriate in light of the nature of the offense and Garman's character.

*I.     Good Time Credit*

Garman first argues that he was deprived of good time credit. At the sentencing hearing, the trial court engaged in the following colloquy with Garman:

> THE COURT:     Let's talk about credit time in Indiana. You understand that now you must serve three days in jail to get one day of good time credit?
>
> [GARMAN]:     Yes, sir.
>
> THE COURT:     Have you discussed that with your attorney, Mr. Britton?
>
> [GARMAN]:     Yes, sir.
>
> THE COURT:     Do you have any questions about good time credit law in the state of Indiana?
>
> [GARMAN]:     No, sir.

Sent. Tr. pp. 3-4. Later at sentencing, the trial court concluded:

Court gives you credit – and listen closely, Mr. Garman. Court gives you credit for 328 days of actual jail time, but the Court declines to award you any good time credit. While you were incarcerated, you attempted to tamper with my jury, and you admitted it on the stand. And there is no way on God's green earth I am giving you good time credit for that behavior. . . .

*Id.* at 42.

[15] To determine whether Garman was entitled to good time credit and whether Garman was erroneously deprived of his good time credit, we must review the statutes at issue. "Matters of statutory interpretation, which inherently present a pure question of law, are reviewed *de novo.*" *Shepard v. State,* 84 N.E.3d 1171, 1172 (Ind. 2017) (citing *Jackson v. State,* 50 N.E.3d 767, 770 (Ind. 2016)) (emphasis supplied).

[16] Garman claims that, "as he was not a credit restricted felon and was awaiting trial for a crime other than a Level 6 felony or misdemeanor, [he] would be assigned to Class B for credit time purposes." Appellant's Br. p. 9. Accordingly, Garman argues, that pursuant to Indiana Code Section 35-50-6-3.1(c), as a Class B offender, he was entitled to one day of good time credit for every three days he spent in jail awaiting trial.

[17] Pursuant to Indiana Code Section 35-50-6-3.1(c), a Class B offender earns "one (1) day of good time credit for every three (3) days the person is imprisoned for a crime or confined awaiting trial or sentencing." The State does not appear to disagree that Garman was a Class B offender, but instead argues that the revocation of Garman's good time credit was statutorily permitted according to

Indiana Code Section 35-50-6-5(a)(2), which states that a person may "be deprived of any part of the education credit or good time credit the person has earned. . ." if the person violates "one (1) or more rules of the penal facility in which the person is imprisoned." Specifically, the State argues that Garman's attempt to tamper with the jury constitutes obstruction of justice. Accordingly, the State argues, because Garman did not follow the law, he presumably broke a rule of the Elkhart County Jail, where Garman was housed, and the trial court acted within its statutory authority to deprive Garman of good time credit.

[18] Garman argues that he was not granted a hearing or other procedural safeguards, such as written notice, prior to his denial of good time credit in violation of Indiana Code Sections 35-50-6-5(b) and 35-50-6-4(f). The State responds that, "[a]lthough the trial court did not conduct a separate hearing, Garman received due process. While he was represented by counsel, he was able to cross-examine the witness, testify on his own behalf, and certainly had the opportunity to call any additional witnesses he wanted[.]" Appellee's Br. p. 12.

[19] Indiana Code Section 35-50-6-5(b) states:

> Before a person may be deprived of educational credit or good time credit, the person must be granted a hearing to determine the person's guilt or innocence and, if found guilty, whether deprivation of earned educational credit or good time credit is an appropriate disciplinary action for the violation. In connection with the hearing, the person is entitled to the procedural

safeguards listed in section 4(c) of this chapter. The person may waive the person's right to the hearing.[5]

Indiana Code Section 35-50-6-4(f) states, with regard to procedural safeguards, that:

> In connection with the hearing granted under subsection (d) or (e), the person is entitled to:
>
> (1) have not less than twenty-four (24) hours advance written notice of the date, time, and place of the hearing, and of the alleged misconduct and the rule the alleged misconduct is alleged to have violated;
>
> (2) have reasonable time to prepare for the hearing;
>
> (3) have an impartial decisionmaker;
>
> (4) appear and speak in the person's own behalf;
>
> (5) call witnesses and present evidence;
>
> (6) confront and cross-examine each witness, unless the hearing authority finds that to do so would subject a witness to a substantial risk of harm;

---

[5] Section 4(c) states: "A person who is a credit restricted felon and who is imprisoned for a crime or imprisoned awaiting trial or sentencing is initially assigned to Class C. A credit restricted felon may not be assigned to Class A or Class B."

(7) have the assistance of a lay advocate (the department may require that the advocate be an employee of, or a fellow prisoner in, the same facility or program);

(8) have a written statement of the findings of fact, the evidence relied upon, and the reasons for the action taken;

(9) have immunity if the person's testimony or any evidence derived from the person's testimony is used in any criminal proceedings; and

(10) have the person's record expunged of any reference to the charge if the person is found not guilty or if a finding of guilt is later overturned.

[20] Indiana Code Section 35-50-6-4(d), referenced above, states that, "A person who is not a credit restricted felon may be reassigned to Class C or Class D if the person violates any of the following: . . . (2) A rule of the penal facility in which the person is imprisoned." Indiana Code Section 35-50-6-4(e), referenced above, includes similar language, but applies to persons who are credit restricted felons. Still, under both sections: "Before a person may be reassigned to a lower credit time class, the person must be granted a hearing to determine the person's guilt or innocence and, if found guilty, whether reassignment is an appropriate disciplinary action for the violation." I.C. § 35-50-6-4(d); *see also* I.C. § 35-50-6-4(e).

[21] Garman's argument requires us to consider two separate issues: (1) whether the deprivation of Garman's good time credit was for a statutorily permitted purpose; and (2) whether the trial court's failure to have a hearing regarding

Garman's good time credit was error. Here, we find the answer to the second question is dispositive. The record is unclear whether the trial court intended to maintain Garman's Class B offender status and simply take away Garman's good time credit, or if the trial court was changing Garman's Class B status to Class D status. In either scenario a hearing is required, thus, the answer to this question does not change the outcome here.

[22] In revoking Garman's good time credit, the trial court expressly noted that Garman was guilty of the offense of attempted jury tampering, which was proved by Garman's testimony at trial and the audio recording of the phone call between Garman and Uribe played at the trial. While we can assume that this was a violation of the penal facility's rules, this fact has not been established. *See Tumbleson v. State,* 706 N.E.2d 217, 218 (Ind. Ct. App. 1999) (finding that: "By statute, Tumbleson was entitled to one day credit time for each actual day served barring proof at a hearing of a violation of the rules of the facility in which he was incarcerated"); *see also Murphy v. State,* 930 N.E.2d 630, 633 (Ind. Ct. App. 2010) (remanding for a hearing on whether the trial court should have granted educational credit time because "the issue of whether Murphy demonstrated a pattern consistent with rehabilitation was never addressed"), *opinion adopted by Murphy v. State,* 942 N.E.2d 818 (Ind. 2011). We believe Garman was entitled to a hearing on this issue pursuant to the statute.

[23] While we do agree with the State that Garman did have the opportunity to call witnesses related to this issue at his trial, Garman's testimony on his attempted jury tampering was limited by the trial court. Specifically, the trial court did not

allow Garman to testify as to the details of the attempted jury tampering in front of the jury because doing so would reveal information that had been excluded pursuant to an earlier trial court ruling. Garman was also not given the opportunity to address the issue of deprivation of his good time credit at his sentencing hearing. Accordingly, Garman was not given the opportunity to fully address his behavior and to be heard on whether restriction of his good time credit was an appropriate response to his attempted jury tampering. *See e.g., Tumbleson,* 706 N.E.2d at 218.

[24] Based on the plain reading of the statute, Garman was not given an appropriate hearing. Accordingly, we reverse and remand to the trial court for a hearing on whether Garman should be deprived of good time credit.

## II. *Inappropriate Sentencing*

[25] Garman next contends that his sentence was inappropriate in light of the nature of the offense and Garman's character. Indiana Appellate Rule 7(B) provides that this court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, we find that the sentence "is inappropriate in light of the nature of the offense and the character of the offender." The defendant bears the burden to persuade this court that his or her sentence is inappropriate. *Wilson v. State,* 966 N.E.2d 1259, 1266 (Ind. Ct. App. 2012) (citing *Childress v. State,* 848 N.E.2d 1073, 1080 (Ind. 2006)), *trans. denied*.

[26] In Indiana, trial courts can tailor an appropriate sentence to the circumstances presented; the trial court's judgment receives "considerable deference." *Sanders*

*v. State,* 71 N.E.3d 839, 844 (Ind. 2017) (quoting *Cardwell v. State,* 895 N.E.2d 1219, 1222 (Ind. 2008)).  In conducting our review, we do not look to see whether the defendant's sentence is appropriate or "if another sentence might be *more* appropriate; rather, the question is whether the sentence imposed is inappropriate."  *Sanders,* 71 N.E.3d at 844 (citing *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008)).

[27]  We look to the statutory ranges established for the classification of the offense.  Garman was found guilty of involuntary manslaughter, a Level 5 felony, as a lesser included offense of murder.  The sentence for a Level 5 felony ranges from one year to six years, with an advisory sentence of three years.  Ind. Code § 35-50-2-6.  Garman was sentenced to six years.

[28]  We first review the nature of Garman's offense.  Garman killed Swartley after a sexual encounter between the men.  Garman kicked and beat Swartley, who was significantly older and weighed approximately eighty pounds less than Garman.  After realizing that he injured Swartley, Garman drove Swartley's vehicle into a wooded area, hid the vehicle, and left Swartley to die, despite Swartley's calls for help.  Although Garman was charged with murder, a jury convicted Garman of involuntary manslaughter, a Level 5 felony.

[29]  Next, we consider Garman's character.  Garman's criminal history, although not extensive, does not reflect well on Garman's character.  Garman's juvenile criminal history includes: a warning and release for a crime that would be, if committed by an adult, criminal trespass; a referral to a juvenile program for a

crime that would be, if committed by an adult, battery, a Class B misdemeanor; and an adjudication as a delinquent for a crime that would be, if committed by an adult, knowingly or intentionally operating a motor vehicle without ever receiving a license, a Class C misdemeanor. Garman's adult criminal history includes a conviction for operating a vehicle while intoxicated, a Class A misdemeanor in addition to the instant offense. Garman also previously violated the terms of his probation by testing positive for cocaine.

[30] Garman's jury tampering also does not reflect well upon his character. Garman recruited Uribe to tamper with the jury in hopes to influence the outcome of the trial. Garman also requested Uribe to ask Garman's grandmother to do the same. Finally, Garman's lack of remorse also does not reflect well upon his character. While Garman indicated at sentencing that he was remorseful, for purposes of the pre-sentence investigation report, when asked if he was remorseful, Garman answered, "I'm not happy or sad about it. I'm kind of sad someone ended up dying for my actions." Appellant's App. Vol. II p. 139. Garman's indifference to Swartley's death, due to Garman's actions, reflects poorly on Garman's character.

[31] While Garman received the maximum sentence for his conviction, his sentence was not inappropriate. The trial court listed numerous aggravators and after weighing the aggravators against the mitigators, the trial court determined that a six-year sentence was appropriate. We do not disagree.

## Conclusion

[32] Garman's sentence was not inappropriate in light of the nature of the offense and Garman's character. The trial court, however, committed error by depriving Garman of his good time credit without a proper hearing. Accordingly, we affirm in part, reverse in part, and remand for a hearing on Garman's deprivation of good time credit.

[33] Affirmed in part, reversed in part, and remanded.

Baker, J., and May, J., concur.